**John LELSZ, et al., Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**John J. KAVANAGH, M.D., et al., Defendants.**

**Civ. A. No. 3–85–2462–H.**

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 30, 1991.

---

**21.** *FDIC v. Renda,* 692 F.Supp. 128, 134 (D.Kan. 1988).

**22.** *Id.*

David Ferleger, Philadelphia, Pa., for plaintiffs.

Dona Hamilton, Asst. Atty. Gen., Austin, Tex., Paul Coggins, Meadows Owens Collier Reed & Coggins, Dallas, Tex., for defendants.

Garth Corbitt, Advocacy, Inc., Austin, Tex., Paul M. Smith (PART), Onek Klein & Farr, Washington, D.C., Rona Statmen, Austin, Tex., for intervenors.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

On November 25 and 26, 1991, the Court held hearings on whether to approve a proposed settlement ("Settlement Agreement") between the Plaintiff class, Defendant, and Intervenor Advocacy Inc., filed August 14, 1991. The Settlement Agreement is opposed by Intervenor Parents Association for the Retarded of Texas ("PART"), as well as by a number of class members. After careful consideration, the Court has determined that the Settlement Agreement is fair, adequate, reasonable, and in the best interests of the class. Accordingly, for the reasons set forth below, it is approved.

## I. HISTORY OF THE CASE

Seventeen years ago, on November 27, 1974, the named plaintiffs filed this suit in the United States District Court for the Eastern District of Texas [1] challenging the adequacy of conditions, care, and habilitation at three of the thirteen large Texas institutions for the mentally retarded. In 1981 the case was certified under Federal Rule of Civil Procedure 23(b)(2) as a class action. The class, at that time, comprised approximately 2,400 residents of the Austin, Denton and Fort Worth state schools for the mentally retarded. Today, the class contains 5,683 members and the suit now involves a fourth state school at San Antonio.

In their "Second Amended Complaint," upon which certification was based, Plaintiffs alleged that the defendants had effectively forced them into large regimented institutions by failing to provide less restrictive alternatives. They alleged further that the care received in the large institutions was wholly inadequate and violative of the rights guaranteed them by the due process clause of the fourteenth amendment to the Constitution of the United States.[2]

Plaintiffs specifically alleged that they had been denied individualized, appropriate habilitative services; that they were treated and cared for by inadequate numbers of qualified staff; that they had been subjected to diseases, neglect, excessive medication, unnecessary restraint, unsafe buildings, inadequate medical and dental care, and physical abuse from other residents and staff. Finally, as part of their prayer for relief, Plaintiffs requested that the three named institutions be closed because, they argued, legally adequate care and habilitation could not possibly be dispensed in a large institutional setting.

In 1983, the parties reached a settlement. That settlement, termed the Resolution and Settlement ("R & S"), was a broadly-worded document designed to provide a "final resolution of the defendants' obligations towards the members of the plaintiff class and of the issues raised by this litigation." R & S at ¶ 5. Approved by the Court on July 19, 1983, the R & S imposed obligations on the State to reach minimally adequate goals in a wide range of areas

---

1. The case was transferred to this Court on November 29, 1985.

2. Those rights include the following: (1) A right to adequate food, shelter, clothing, and medical care; (2) A right to reasonably safe conditions of confinement; (3) A right to be free from undue bodily restraint; (4) A right to the training and development of those skills needed to ensure safety and to facilitate clients' ability to function free from bodily restraint. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Vitek v. Jones,* 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1262–64, 63 L.Ed.2d 552 (1980); *Mills v. Rogers,* 457 U.S. 291, 298–302, 102 S.Ct. 2442, 2447–2450, 73 L.Ed.2d 16 (1982). For a full discussion of these rights within the context of this case, *see Lelsz v. Kavanagh,* 673 F.Supp. 828, 833–35 (N.D.Tex.1987).

pertaining to the care and treatment of the mentally retarded in Texas. Additionally, the R & S called for the appointment of an Expert Consultant to monitor the implementation of the R & S. R & S at ¶¶ 25, 36. The Plaintiffs and Defendants later agreed that Linda O'Neall should be appointed Expert Consultant; she has continuously served in that capacity since her appointment on March 19, 1984.

The R & S contained no provision for the closure of any schools. It did, however, impose an obligation on the State to use "best efforts to overcome all obstacles and barriers to the creation of facilities and programs for habilitation outside the institution ..." R & S at ¶ 9. More specifically, the R & S required the State to "provide each member of the plaintiff class with the least restrictive alternative living conditions possible consistent with the person's particular circumstances, including age, degree of retardation and handicapping condition." R & S at ¶ 8.

The Fifth Circuit subsequently held that the provisions requiring habilitation in the least restrictive setting did not mandate community placements, as had been argued by the Plaintiffs and determined by this Court. *Lelsz v. Kavanagh*, 807 F.2d 1243, 1255 (5th Cir.1987). Instead, the Fifth Circuit held that the State's obligation under the R & S to provide habilitation in the least restrictive setting was no greater than its obligation under existing state law. For that reason, consistent with the Supreme Court's ruling in *Pennhurst State School v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the court held that the State had not waived its Eleventh Amendment defense and, therefore, a federal court lacked jurisdiction to compel the State to set up community facilities. *Lelsz v. Kavanagh*, 807 F.2d at 1254–55.

In the Summer of 1987, this Court held extensive hearings on the State's performance in complying with the R & S. The Court found that the State had violated numerous obligations under the R & S by failing to provide, *inter alia*, "required habilitation, required freedom from abuse and neglect, required individual treatment, and

required safe conditions ..." *Lelsz v. Kavanagh*, 673 F.Supp. 828, 831 (N.D.Tex. 1987). Accordingly, the Court held the State in contempt of court.

Soon after the contempt hearings, the parties agreed to an Implementation Agreement, which was designed to provide the State with clear and concrete standards by which it could achieve compliance with the R & S. *See* Implementation Agreement, filed October 15, 1987. The Implementation Agreement contains 45 paragraphs that specifically outline the State's remaining obligations in the suit. Paragraphs 1 through 4 state the conditions for accreditation by the Accreditation Council on Developmental Disabilities ("ACDD"). ACDD is the generally accepted national authority on standards for the quality of services provided for persons with developmental disabilities. Paragraphs 5 through 10, referred to as the "Interim Measures," contain perhaps the most important of the State's obligations. The Interim Measures establish minimum standards for the delivery of professional services in the Texas state schools. Those services include medical, psychological, and educational services, as well as institutional protections against abuse, neglect, and injury. Paragraphs 11 through 24, often referred to as the "upper paragraphs," establish a variety of other requirements designed to improve the quality of care within the state schools. Paragraphs 25 through 40 address a different issue; they address the quality of placements and standards of care in the State's community programs for the mentally retarded. Finally, paragraphs 41 through 45 direct the State to provide the Expert Consultant and the Court with reports detailing various aspects of the treatment received by class members and the State's compliance with the Implementation Agreement.

Since Fall 1987, when the Implementation Agreement went into effect, the Expert Consultant has been monitoring the state's compliance with the Implementation Agreement. By design, once the State fully complies with the Implementation Agreement, all Court oversight ends and the lawsuit is dismissed. Regrettably, reaching such a conclusion to the suit has been a

difficult process, both for the State to implement and for the Court to monitor.

The last four years have seen numerous battles between the parties over the meaning of "compliance" and the meaning of various paragraphs of the Implementation Agreement. These battles threatened to culminate in a contempt hearing originally set for Summer 1991. The prospect of such a hearing created added impetus, particularly on behalf of the State, to reach a new settlement, a settlement which truly represented a final end to this protracted litigation.

## II. THE SETTLEMENT AGREEMENT

On August 14, 1991, three of the four existing parties to this suit presented to the Court for preliminary approval the Settlement Agreement now at issue. Joining in the Settlement Agreement were the State, the Plaintiffs (as represented by class counsel, David Ferleger), and one of the two intervenors, Advocacy, Incorporated. The other intervenor, PART did not join in the Settlement Agreement and now opposes its final approval by the Court.

On September 13, 1991 the Court preliminarily approved the Settlement Agreement and ordered distribution of notice to class members pursuant to Federal Rule of Civil Procedure 23(e). The notices were provided publicly through newspapers (of general circulation in four cities) and state school bulletin board announcements and personally through letter or verbal explanation as determined most appropriate for the individuals being provided notice.[3] Notice, through all means, was effectuated no later than September 27, 1991. *See* Notice Stipulation, filed November 25, 1991. None of the four parties to the suit has challenged the adequacy of the notice or notice procedures in this case.

By the terms of the notice, objections were to be filed by November 4, 1991. A total of 522 letters were received in response to the notices. Of the 522 letters, approximately 370 were objections from persons on behalf of class members. Thus, approximately 6.5 percent of the 5,683 class members objected to some aspect of the settlement.

If approved by the Court, the Settlement Agreement would supersede the Implementation Agreement that now governs the lawsuit. Settlement Agreement ¶ 12. For that reason, the arguments over whether the Court should approve the Settlement Agreement have focused largely on whether the class benefits more under the Settlement Agreement or under the current Implementation Agreement. The three settling parties—the State, the Plaintiffs, and Intervenor Advocacy—contend that the class stands to gain more under the Settlement Agreement because the majority of the goals set for the State in the Implementation Agreement have already been reached, and those goals that remain unfulfilled are likely to remain that way. Intervenor PART argues, on the other hand, that the Settlement Agreement trades away valuable protections provided the class by the Implementation Agreement in favor of benefits under the Settlement Agreement that PART terms either illusory or ideological. The Court will attempt to briefly set out what is both gained and lost by the class under the proposed settlement.

### A. *Benefits to the Class*

The State, the Plaintiffs, and Intervenor Advocacy identify a number of benefits to the class. The most prominent—and controversial—provision of the Settlement Agreement calls for the closure of two state schools and the placement of 600 individuals into community programs. *See* Settlement Agreement ¶¶ 1, 7, 8, 11. Paragraph 1 of the Settlement Agreement provides that the "Agreement is contingent upon the passage of legislation by the Texas legislature ... which creates a Task

---

**3.** In total, 6,741 notices were sent to class members and their correspondents or guardians. Newspaper notices were published on Sunday, September 22 and Wednesday, September 25, 1991 in the Austin American Statesman, Dallas Morning News, Houston Chronicle, and San Antonio Express News. Furthermore, 520 notices were posted on state school bulletin boards. *See* Notice Stipulation, filed November 25, 1991.

Force to be appointed by the Governor ...., which is to make recommendations regarding state schools for the mentally retarded on or before March 31, 1992." This legislation was enacted in Summer 1991. Paragraph 4 provides that if the Task Force recommends to close at least two schools, "Defendants shall be relieved of all requirements and obligations under the Implementation Agreement and the Resolution and Settlement." Paragraph 11, furthermore, makes dismissal of this suit contingent on "the placement of individuals in the community in a number equal to 300 placements a year from the date of the execution of this Agreement to the date of the closure of the first state school (but no fewer than 600 placements in total)."

The settlement thus gives the Plaintiffs two of the central objectives sought in their complaint: the closure of large institutions that house mentally retarded individuals and the creation of additional, more intimate, community based programs. After the Fifth Circuit held that the class members had no constitutional right to habilitation in the least restrictive environment, *see Lelsz v. Kavanagh*, 807 F.2d at 1251, it appeared that the goals of school closure and expedited community placement were unattainable. Now, under the proposed settlement, the State has waived its Eleventh Amendment defense and entered into an enforceable agreement to give the Plaintiffs much of what they originally requested.

The settling parties have identified a number of other benefits accruing to the class under the Settlement Agreement. The settlement provides that at least 95 percent of the 600 community placements will be into homes of no more than six residents. Settlement Agreement ¶ 11. A small setting with a limited number of residents is considered the linchpin of a successful community placement. Another provision calls on the State to establish an independent authority, outside the Texas Department of Mental Health and Mental

Retardation ("TXMHMR" or the "Department"), to investigate alleged abuse and neglect at the Department's facilities and community programs. That same provision also provides that the Department will seek funding to hire at least one trained investigator for each of the thirteen state schools. Settlement Agreement ¶ 10. The settlement further requires the State to simplify its process for individual appeals of community placement decisions. Settlement Agreement ¶ 9.

Some of the most important gains under the Settlement Agreement relate to programs in the community. This aspect of the settlement is important because an increasing percentage of the class now resides in community homes. The State estimates that approximately 53 percent of the "active" class members currently reside in state schools, while approximately 43 percent reside in community programs. *See* Post Hearing Brief of Defendants, at 5. The increase in community services that will result from the Settlement Agreement benefits both the class members now in the community and those to be placed in the future. Additionally, the increase in community based services will bring Texas more in line with the rest of the country, which has, for the most part, placed a much greater emphasis on community services than has Texas.[4] The principal goal of the Settlement Agreement is to improve the configuration of services for the mentally retarded such that the services offered are more narrowly tailored to the individual needs and abilities of each mentally retarded client.

Presently, 1,400 individuals in state schools have been recommended by their interdisciplinary teams ("IDTs") for placement in the community, of whom more than 600 are class members. The settlement increases the likelihood that the IDT recommendations for community placement of those 600 class members will be implemented. Furthermore, the Settlement

---

**4.** Compared with other states, Texas ranks first in percentage of total spending allocated to congregate state school settings, and last in allocations for community services. In its utiliza-

tion of traditional large institutional care in state schools, Texas ranks behind only Mississippi and Oklahoma. Testimony of Braddock.

Agreement retains many of the gains in quality of community services secured under the Implementation Agreement: community standards, case management, regional monitors, individual habilitation plans, IDT recommendations, and the admissions policy. Settlement Agreement ¶¶ 7, 8, 9. Finally, pursuant to an additional stipulation entered into by the parties in connection with the Settlement Agreement, *See* Monitoring Stipulation, filed November 22, 1991, and approved by the Court herewith, the duties of the Expert Consultant to monitor community placements will be much more extensive than they have been under the Implementation Agreement. Under the Monitoring Stipulation, the Expert Consultant will review the Department's files and documents pertaining to each of the 600 community placements under the Settlement Agreement, as well as performing a site review of up to twenty-five percent (or 150) of the 600 placements over two years.

## B. Drawbacks to the Settlement

Intervenor PART strenuously opposes the Settlement Agreement and, throughout the settlement approval proceedings, has served as the primary vehicle through which objectors have made their opinions known. PART has advanced a number of arguments about the relative worth (or non-worth) of the benefits to the class under the Settlement Agreement; PART argues that the value of the gains under the settlement has been overstated. It further contends that the class stands to gain more from the Implementation Agreement than the Settlement Agreement. The Court will consider the Implementation Agreement further in section IV of this opinion, within the context of the six factors the Court must consider in approving any class action settlement.

During the course of the settlement approval hearings, the most frequently cited harm from the settlement was the closure of two schools and the accompanying increase in community placements. Parents of retarded individuals, as well as counsel for PART, expressed several specific concerns about closure and placement. First,

many expressed the fear that their child might be recommended for community placement over their objection. A second fear was that the particular school where their son or daughter resides might be closed, thus requiring relocation to a new school potentially further from the parents' home. This fear is especially prevalent among parents who believe that their own child will never be an appropriate candidate for community placement. Others expressed alarm that closing two schools might cause the remaining eleven schools to become overcrowded and make admission of new clients more difficult.

## III. THE ROLE OF PART AS INTERVENOR AND OBJECTOR

 Intervenor PART has asserted that the Court cannot approve this settlement over PART's objection. The Supreme Court addressed the power of an intervenor to block a class action settlement in *Local Number 93 v. City of Cleveland,* 478 U.S. 501, 528–30, 106 S.Ct. 3063, 3078–79, 92 L.Ed.2d 405 (1986). In *City of Cleveland,* the Court affirmed the district court's approval of a consent decree entered in a class action over the objection of an intervenor. In addressing the rights possessed by an intervenor, the Court stated the following:

"It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent."

*Id.* at 528–29, 106 S.Ct. at 3079. Thus, ordinarily the objection of an intervenor will not prevent a court from approving a class action settlement.

The Supreme Court limited its holding, however, by noting that "parties who choose to resolve litigation through settlement may not dispose of the claims of a

third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement." *Id.* at 529, 106 S.Ct. at 3079. PART has not contended that the Settlement Agreement imposes duties or obligations on PART. However, it does argue, albeit obliquely, that the settlement disposes of legal claims possessed by PART. PART contends that it has a "contractual right" to enforce the Implementation Agreement, which is vitiated by the Settlement Agreement. PART apparently equates the Supreme Court's statement that a settlement cannot dispose of "the claims" of a third party with PART's own statement that a settlement cannot affect "legal" or "contractual" rights of a third party.

The Court concludes that PART's rights under the Implementation Agreement, whatever they may be, do not confer on PART the power to block all further attempts by the other parties to reach a final settlement. PART has overestimated its role as a permissive intervenor in this suit. Numerous courts have recognized that the sum of the rights possessed by an intervenor is not necessarily equivalent to that of a party in a case and depends upon the nature of the intervenor's interest. *Kirkland v. New York State Dept. of Correctional Services,* 711 F.2d 1117, 1126 (2nd Cir.1983); *see Boston Tow Boat Co. v. United States,* 321 U.S. 632, 64 S.Ct. 776, 88 L.Ed. 975 (1944); *Airline Stewards & Stewardesses Assoc., Local 550 v. American Airlines, Inc.,* 573 F.2d 960, 964 (7th Cir.1978) (per curiam), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979). Furthermore, in determining what rights an intervenor possesses, courts frequently distinguish between intervenors as of right and permissive intervenors. 7C Wright, Miller & Kane, Federal Practice and Procedure § 1902 (1986). Generally, an intervenor as of right possesses a broad range of rights not accorded a permissive

intervenor. *Id.* "An intervenor as of right becomes a party to the action because 'the disposition of the action may as a practical matter impair or impede his ability to protect that interest,' Fed.Rule Civ.Proc. 24(a), whereas a permissive intervenor typically becomes a party only to ward off the potential effects of *stare decisis.*" *City of Cleveland,* 478 U.S. at 539, 106 S.Ct. at 3084 (Rehnquist, J., dissenting). Additionally, an application for permissive intervention, unlike intervention as of right, is addressed to the discretion of the court, and the court, accordingly, may impose various conditions or restrictions on the scope of intervention. 7C Wright, Miller & Kane, Federal Practice and Procedure § 1922 (1986).

PART is not an intervenor as of right, but merely a permissive intervenor. PART was permitted to intervene, pursuant to Federal Rule of Civil Procedure 24(b), in the Fall of 1983, some nine years after the suit had commenced *and* after the Court had already approved the Resolution and Settlement agreed to by the Plaintiffs and the State. As noted above, the subsequent Implementation Agreement, to which PART is a signatory, was designed merely to serve as a plan for implementing the Resolution and Settlement, to which PART is *not* a signatory.[5] We thus have a situation where the primary litigants are attempting to resolve their final differences by abrogating their earlier agreement (the Resolution and Settlement), but a permissive intervenor, who joined in a plan of implementation of that earlier agreement, seeks to prevent them. PART has cited no court decisions where an intervenor—let alone a permissive one—was granted such power.

To the contrary, a number of courts have explicitly held that an intervenor's power to oppose a settlement, even when its interests are affected, is limited to the right to air its objections to the reasonableness of

**5.** It should be noted that PART strenuously opposed the Resolution and Settlement in 1983 and organized the objectors who testified in opposition to it at the settlement approval hearings. *See Order Approving Resolution and Settlement,* filed July 1983, at 26. It is ironic that

PART is fighting the current settlement by defending its rights under a plan of implementation for an earlier settlement, the Resolution and Settlement, which it never wanted in the first place.

the settlement and to introduce evidence. *See Kirkland,* 711 F.2d at 1125–1128; *Equal Employment Opportunity Commission v. American Telephone & Telegraph Co.,* 556 F.2d 167, 173–74 (3rd Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). In *Kirkland,* for instance, a group of non-class member/non-minority intervenors opposed a class action settlement between their employer and a group of minority employees who had alleged employment discrimination. The proposed settlement would have changed the promotional procedures of the employer and had an adverse impact on the intervenors' future promotions. The court stated that

"although non-minority third parties allowed to intervene in cases which involve consent decrees or settlement agreements implementing race-conscious hiring or promotional remedies do have a sufficient interest to argue that the decree or agreement is unreasonable or unlawful, their interest in the expectation of appointment does not require their consent as a condition to any voluntary compromise of the litigation."

*Kirkland,* 711 F.2d at 1126 (citations omitted).

Similarly, in *Equal Employment Opportunity Commission v. American Telephone & Telegraph Co.,* 556 F.2d at 173, three intervening unions objected to a consent decree that contained affirmative action employment provisions which abrogated various rights claimed by the unions under collective bargaining agreements. The unions argued that the consent decree was invalid because it affected their rights under the collective bargaining agreements. The court rejected this argument, stating that "[t]o the extent that third party rights in which the unions are interested have been affected, they were allowed to intervene and be heard in this case." *Id.* The court concluded that the collective bargaining agreements conferred on the unions the right to be heard and to object to the consent decree, but it did not confer the power to block the decree.

Finally, two additional points deserve mention. First, it is not at all clear what interests or "rights" PART seeks to assert under the Implementation Agreement. In its post-trial memorandum, PART argued that retaining the Implementation Agreement would assure "continuing guarantees of overall quality in the state schools" and, in particular, require improvement in the area of behavioral services, which is one of the requirements under the "Interim Measures" of the Implementation Agreement. Intervenor PART's Post–Trial Memorandum, at 4–5. Yet PART has previously urged this Court to adopt interpretations of the Implementation Agreement that would virtually end court supervision over the state schools. *See* Intervenor PART's Brief in Response to Order of April 26, 1991, filed May 10, 1991. In preparation for an anticipated hearing on the State's compliance with the Implementation Agreement, PART argued that when a school becomes accredited by the ACDD for the first time, that school should be exempted from further compliance with the Interim Measures of the Implementation Agreement. *Id.* at 2. During the settlement approval hearings, the Expert Consultant testified that all four named schools have now obtained ACDD accreditation at least once. Thus, under PART's interpretation, the most important requirements under the Implementation Agreement would no longer be effective. Furthermore, with regard to the "upper paragraphs" of the Implementation Agreement, PART stated that they were "ambiguous" and strongly suggested that the Court issue an "order cutting off further enforcement of these paragraphs." *Id.* at 8–9. Indeed, it is ironic that PART now seeks to invoke "contractual rights" that just a few months earlier it claimed no longer existed.

The other benefit under the Implementation Agreement identified by PART is the continued improvement in services for class members living in the community. Intervenor PART's Post–Trial Memorandum, at 4–5. PART's purpose in intervening in this lawsuit, however, was not to improve the quality of services in the community, but to (1) assert the right of its constituents to

remain in large institutions and (2) improve the quality of services provided in those institutions. *See Order Approving Resolution and Settlement,* filed July 19, 1983, at 40–43 (court inviting PART to file motion to intervene); *see also Lelsz v. Kavanagh,* 710 F.2d 1040, 1046–47 (5th Cir. 1983) (court summarizing the interests PART claimed were not adequately represented by other parties and which, thus, justified PART's intervention). For this reason, it is hard to take seriously PART's new found concern, or "contractual interest," in the quality of community services. Aside from that, the Settlement Agreement retains or improves upon many of the quality assurance mechanisms for community services provided under the Implementation Agreement. For instance, the Settlement Agreement, with its accompanying Monitoring Stipulation, provides for more extensive monitoring of community placements than has existed under the Implementation Agreement.

The second remaining point is that PART now claims to be the "de facto" representative of the class members who object to the proposed settlement. It is well recognized that a court can approve a class settlement over the objection of a substantial number of class members. *See, e.g., Reed v. General Motors Corp.,* 703 F.2d 170, 174–75 (5th Cir.1983). Essentially, PART would have the Court believe that, by mere virtue of its status as intervenor and signatory to a plan of implementation, it has greater rights and authority to block the settlement than the actual class members whose very lives are actually affected by it. The Court cannot accept this proposition.

In conclusion, PART's interest in the Implementation Agreement alone, though it entitles PART to be heard on the reasonableness and legality of the settlement, is not so strong as to require its consent to the settlement. PART took full advantage of its opportunity to participate in the settlement approval hearings. It was permitted to air its objections and to introduce relevant evidence. The Court will more fully address those objections below. In short, PART has received all the process it was due. *See City of Cleveland,* 478 U.S.

at 529, 106 S.Ct. at 3079; *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 400, 102 S.Ct. 1127, 1136, 71 L.Ed.2d 234 (1982).

## IV. SETTLEMENT APPROVAL

In order to approve a proposed class action settlement, the Court must find that it is fair, adequate, and reasonable. *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *In re Corrugated Container,* 643 F.2d 195, 207 (5th Cir.1981). In making this determination, the Court must recognize its special obligation to the class: the Court must "ensure that the settlement is in the interests of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978).

The Fifth Circuit has determined that the propriety of a proposed settlement should be measured by six factors: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery and the certainty of damages; and (6) the opinions of the participants, including class counsel, class representatives, and the absent class members. *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983); *Parker v. Anderson,* 667 F.2d at 1209. Accordingly, the Court will analyze the terms of the proposed settlement within this framework.

### A. Fraud or Collusion

No party has suggested that the Settlement Agreement was a product of anything other than bona fide arms-length negotiations between adversaries. The lawsuit has been vigorously litigated for a number of years. The present settlement was reached prior to an important contempt hearing and demanded considerable effort from the parties.

## B. Complexity, Expense, and Likely Duration of Suit

Seventeen years of vigorous litigation have fully demonstrated both the complexity and expense of this suit. The Settlement Agreement is an attempt to reduce the expense and duration of the suit. Without the settlement, the parties would face an expensive and lengthy contempt hearing. Additional contempt hearings would likely occur in subsequent years. Therefore, it is in the interest of all parties to settle this case and channel funds away from litigation and into services for the individuals on whose behalf this suit was brought.

## C. Stage of the Proceedings and Amount of Discovery

After seventeen years of litigation, the parties are sufficiently informed about the merits of their positions to enter into this proposed settlement.

## D. Range of Recovery and Probability of Plaintiffs' Success on the Merits

Given the unique procedural status of this case, the range of recovery and probability of success factors are hopelessly intertwined. Furthermore, a serious question exists as to how these factors are to be applied. Unlike the usual lawsuit, this case is not proceeding forward toward an anticipated trial on the merits. Instead, the parties are operating under a previous settlement agreement (the R & S and Implementation Agreement), which defines the relief to which the parties have agreed the plaintiffs are entitled. The only potential "trials" are contempt hearings for determining whether the State is complying with the terms of the Implementation Agreement. Essentially, the range of recovery and probability of success factors are designed to assess what the Plaintiffs lose—or potentially lose—by entering into the settlement. The Court, therefore, considers the appropriate inquiry to be whether the Settlement Agreement is fair, adequate, and reasonable when compared with the plaintiffs' probability of complete success under the Implementation Agreement. This in-

quiry necessarily entails a detailed examination of the current level of compliance with the Implementation Agreement. There are two relevant questions: What percentage of the Implementation Agreement is in non-compliance? And what is the likelihood that the remaining obligations will ever be satisfied?

As noted above, the Interim Measures of the Implementation Agreement establish minimum standards for the delivery of professional services in the Texas state schools. Reflecting the importance of these provisions, much of the testimony addressing the State's compliance with the Implementation Agreement focussed on the Interim Measures. As presented by the Expert Consultant, Linda O'Neall, the Interim Measures are comprised of twenty-six provisions, with which each of the four named schools must comply, thus creating a total of 104 separate requirements. O'Neall testified that the State had complied with 78 percent of the Interim Measures. A year earlier, in 1990, the state had been in compliance with only 37 percent. O'Neall attributed the substantial improvement to a significant "change of attitude by the State in the last four or five years." Specifically, she cited the State's increased funding of programs and improvement of services for the mentally retarded. One of the most significant changes, she felt, was that the State had learned to analyze the quality of its programs and services more critically.

Of those Interim Measures in which the State was in non-compliance, the vast majority related either to one particular school, Fort Worth State School, or to behavior treatment services. The problems relating to these areas are unique and apparently among the more difficult to remedy. As to behavior treatment services, O'Neall cited as a major cause of the State's non-compliance the absence at Texas colleges and universities of behavioral psychology programs designed to train psychology students for employment in schools for the mentally retarded. Because the solution to this problem is largely out of the hands of those whose job it is to

comply with the Implementation Agreement, the behavior treatment obligations will likely remain difficult to satisfy in the future.

The peculiar recurring problems at the Fort Worth State School ("FWSS") have been a significant concern for the Court throughout this litigation. Nevertheless, the problems at FWSS do not justify rejection of the Settlement Agreement. O'Neall testified that FWSS is the most well-funded state school and has the best staff/client ratio. These facts suggest that FWSS's poor compliance performance is attributable to something other than inattention by the State. Furthermore, after the settlement approval hearings ended, the Court became aware that on December 13, 1991 the ACDD recommended accreditation for the FWSS for a second time. *See* Defendants' Response Regarding FWSS, filed December 19, 1991. As provided in the Implementation Agreement, that means that FWSS is no longer bound by the Interim Measures. Thus, the State's level of compliance with the Interim Measures of the Implementation Agreement is in fact substantially higher than was thought at the settlement approval hearings.[6]

The State has also shown substantial improvement in complying with the rest of Implementation Agreement's provisions. O'Neall testified that the State's level of compliance with all provisions affecting the state schools, including the "upper paragraphs," is 66 percent. A year earlier, that figure had been only 39 percent. Furthermore, with respect to the Implementation Agreement paragraphs that address community based programs, O'Neall reports that in 1990 the State was in compliance with 61 percent of the requirements. No assessment has been made for 1991. She asserted, however, that the compliance percentage would be higher if an assessment were made now.

In sum, the picture painted by O'Neall is one where the State has made substantial progress in improving the quality of services provided the mentally retarded in the four named state schools and in community programs. The Plaintiffs have received most of the benefits offered by the Implementation Agreement. Furthermore, the likelihood that the Plaintiffs would ever enjoy complete success under the Implementation Agreement is exceedingly small. The evidence suggests that the Implementation Agreement is approaching the end of its useful life and its remaining value to the Plaintiffs is limited.

When weighed against this background, the terms of the Settlement Agreement are fair, reasonable, and adequate. The settlement gives the Plaintiffs more of what they originally asked for than does the Implementation Agreement. *See supra* pp. 287–88. The principal difference is that the Settlement Agreement constitutes a significant step toward deinstitutionalization for those mentally retarded individuals whose lives would be more enriched in a community setting. Currently, 1400 individuals, including 600 class members, are patiently waiting for the State to place them in an environment more appropriate for their individual needs and capabilities. The Settlement Agreement promises to

---

6. Court approval of the proposed Settlement Agreement was placed in jeopardy when on December 6, 1991 the Texas Department of Health ("TDH") decertified FWSS as an Intermediate Care Facility for the Mentally Retarded (ICF/MR), the effect of which was to cause FWSS to lose its federal Medicaid funding. Thirteen days later, TDH recertified FWSS, thus reinstating the Medicaid funding. The Court requested the parties to provide briefs on what effect the temporary cutoff of Medicaid funds should have on the Court's decision on whether to approve the proposed Settlement Agreement. The Court has determined that, although it underscores the lingering problems at FWSS, the temporary decertification is not an adequate ground for rejecting the settlement. After the decertification occurred, FWSS undertook a number of corrective actions to regain certification. *See* Defendant's Response Regarding FWSS, at 9. TDH was sufficiently satisfied with those corrective actions to recommend recertification. The Court has no legitimate basis for questioning TDH's judgment.

The facts now before the Court are essentially the same as existed during the settlement approval hearings—FWSS is a fully funded ICF/MR institution. The only significant difference is that FWSS has now been recommended for ACDD accreditation a second time, a fact weighing in favor of settlement approval.

shorten that wait for many of them. Additionally, as set forth above in Section III, the Settlement Agreement preserves or improves on many of the principal gains achieved through the Implementation Agreement.

### E. Opinions and Objections

The Settlement Agreement has been presented to the Court with a broad base of support. First and foremost, the settlement is endorsed by defense and class counsel, two parties with a long antagonistic relationship in this suit. In deciding to approve a settlement, "[t]he judge should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery." *Manual for Complex Litigation*, § 30.41 (2nd Ed.1985); *see Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977). Here, the Court considers class and defense counsel capable and experienced; their past performance suggests that their opinions deserve appropriate deference from the Court.

The Settlement Agreement also derives support from several influential organizations committed to improving the services provided for the mentally retarded. For instance, Advocacy, Inc., an intervenor in this case, is a non-profit corporation created to advocate and protect the legal rights of the developmentally disabled. Advocacy, Inc. participated in all aspects of the settlement negotiations as well as the settlement approval hearings and concludes that the Settlement Agreement is "fair, equitable, and in the best interest of both named and unnamed class members." Intervenor Advocacy Inc.'s Brief in Support of Settlement Agreement, at 1. Another important organization supporting the settlement is the Association for Retarded Citizens/Texas ("ARC/Texas"), which has approximately 5,000 members. Testimony of Janelle Jordan, immediate past ARC/Texas president. Its members include people with mental retardation, family members, friends and professionals who are interested in advocating for the rights of the mentally retarded. The settlement is also supported by the Texas Planning Council for People with Developmental Disabilities, a federally funded organization designed to assist in the development of a comprehensive array of services for people with developmental disabilities who seek to live and work in community settings. The Planning Council believes that "funding for services in Texas are disproportionately directed toward institutional services" and that "the absence of community services has prevented 1,600 individuals, living in state schools but identified for community placement, from being able to move to the community." Testimony of Roger Webb, Executive Director. Because the Planning Council, ARC/Texas, and Advocacy, Inc., have long distinguished histories in advocating for the rights of the developmentally disabled, their opinions and conclusions deserve great weight.

Although widely supported, the Settlement Agreement is not without its detractors. The primary critic, of course, is PART, which vigorously opposes the closure of any schools. In its opposition to school closure, PART has traditionally been allied with the State. Under the new settlement, however, PART stands alone in its fight against the closing of two large institutions. Additionally, the Court received objections from approximately 6.5 percent of the class members or their guardians. The Court, of course, may approve the settlement over the objection of a large number of class members. *Reed v. General Motors Corp.*, 703 F.2d 170, 174 (5th Cir.1983); *Cotton v. Hinton*, 559 F.2d at 1331. Here, the Court considers the number of objections significant, but notes that the number is relatively small when compared with some other cases where courts have approved class action settlements. *See, e.g., Reed v. General Motors Corp.*, 703 F.2d at 174 (settlement approved over objection of 40 percent of class); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir.1982) (settlement approved over objection of 55 percent of

class); *Cotton v. Hinton,* 559 F.2d at 1333 (settlement approved over objections of counsel purporting to represent almost 50 percent of class). Nevertheless, the substance of the objections deserve airing. The vast majority of the approximately 370 class members who wrote the Court stated that the reason they opposed the settlement was because it might cause two schools to close. As briefly outlined above in Section II, the prospect of school closure has created several fears in the minds of class members and their relatives.

The first such fear is that residents will be inappropriately placed in community programs over the objection of their guardians. The Settlement Agreement, however, does not abrogate any preexisting rights of parents and relatives to oppose placement. Nor does it erode the standards by which the appropriateness of placements is determined. Paragraph 8 of the Settlement Agreement provides that "[p]lacements from the schools and admissions to the schools will continue to be made in accordance with the individual habilitation plan, and the rules, policies, and quality assurance mechanisms of the Department, including case management services, community standards and monitoring." The Settlement Agreement promises, furthermore, to increase input from parents and guardians in decisions regarding community placement; Paragraph 9 commits the State to simplify the process for appealing placement decisions. Also, as discussed above, the Expert Consultant's ability to monitor community placements and programs is greatly enhanced by the settlement.

The second fear is that, as a result of school closure, residents will be relocated to new schools that are further from the guardians' home, causing undue hardship on the family and creating additional stress for the school resident. It is certainly true that closing a school may cause some residents deemed inappropriate for community placement to be relocated to one of the remaining eleven state schools. The Court recognizes that in some cases hardship will result. The reality is, however, that the State has always possessed the power—and frequently exercises the power—to re-

locate its residents for its own administrative needs. If it so desired, the State could unilaterally close any of the State schools, for economic reasons or otherwise. The ability of individual residents and parents to fight closure of their own school would likely be limited to political means. Under the Settlement Agreement, those same political avenues of redress exist. The decision of whether to close any school, and which schools to close, will be determined by the Task Force appointed by the Governor. The Task Force is the appropriate forum for parents, guardians, and residents to air their opposition to the closure of any one school.

The third fear is that closing two schools might cause the remaining eleven schools to become overcrowded and make admission of new clients more difficult. Jaylon Fincannon, Deputy Commissioner for TXMHMR testified, however, that the population in the Texas state schools has been decreasing in recent years. In 1980, the institutional population in Texas was about 11,000; today the institutional population is about 6500. Testimony of Braddock. These numbers indicate that closing two of the thirteen schools will not cause overcrowding or prevent the admission of new residents. Furthermore, the natural result of increases in community placements is that fewer beds are needed in the schools. As those residents appropriate for placement eventually move into the community, a natural point of equilibrium can be expected to emerge whereby the number of available beds in the schools closely corresponds with the number of individuals in need of institutional care.

One final fear is the fear of the unknown when this Court is no longer actively monitoring the State's performance under the Implementation Agreement and Resolution and Settlement. The class members have become accustomed to the Court's watchful eye. The parent of one named class member, for instance, wrote to the Court contending that the State will never "honor its obligation to the retarded without active court involvement" and requesting "ongoing, intrusive involvement" by the Court.

It is not the proper role of the Court, however, to exercise permanent judicial control over the state schools. PART, in particular, has recognized this fact. "We are concerned ... that as the [Implementation] Agreement moves toward completion, the continued occurrence of isolated problems ... should not become the basis for an indefinite extension of this broad-based class action." Intervenor PART's Brief in Response to Order of April 26, 1991, at 11–12. The Court concurs with PART that "certification of the class should not transform the named plaintiffs, or the intervenors for that matter, into a permanent 'roving commission' authorized to seek out discrete problems and bring them to court for resolution." *Id.* at 12. Instead, this suit should be brought to a suitable conclusion. No doubt, discrete injustices may continue to occur in the state schools. The affected parties in such situations will be free to assert their rights through individual claims.

The last remaining issue is whether the Plaintiffs received adequate representation from their attorney during the settlement negotiations. In a letter dated October 3, 1991, John Lelsz, Sr. and Ruth Lelsz, parents of named plaintiff John Lelsz, Jr., requested that the Court replace Plaintiffs' attorney, David Ferleger. They suggested that Ferleger had failed to adequately consult with them during the settlement negotiations. The Court refused to remove Ferleger at that time, finding insufficient evidence that Ferleger was not adequately representing the class. *See Memorandum Opinion and Order*, filed October 24, 1991. The Court, however, stated that it would consider this issue in evaluating the settlement proposal.

The duty owed by class counsel is to the entire class and is not dependent on the special desires of the named plaintiffs. *Parker v. Anderson*, 667 F.2d at 1211. Furthermore, the Fifth Circuit has stated that whether an attorney has represented the class fairly and adequately is determined largely by whether he secures and submits a fair and adequate settlement. *Id.* The Court has now had the opportunity to fully review the submitted settlement and finds it fair, adequate, reasonable, and in the best interests of the class. For this reason, as well as having watched his performance for a number of years, the Court remains convinced that Ferleger has provided fair and adequate representation to the plaintiff class as a whole.

## V. CONCLUSION

Because of this litigation significant and lasting improvements have been made in the care of the mentally retarded citizens of this state. When the Settlement Agreement is fulfilled Plaintiffs will have gained most of what they originally sought. The Court believes that the proposed Settlement Agreement is a just and realistic conclusion to this litigation and that approval by the Court is in the best interests of the mentally retarded.

The Settlement Agreement is APPROVED.

SO ORDERED.