[No. B230817. Second Dist., Div. Two. Aug. 10, 2012.]

SHARAIL REED et al., Plaintiffs and Respondents, v.
UNITED TEACHERS LOS ANGELES, Defendant and Appellant;
LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

━━━━━━━━━━━━━━━━━━━━━━━━━━━

**COUNSEL**

Holguin, Garfield, Martinez & Quiñonez, Jesús E. Quiñonez; Altshuler Berzon, Stephen P. Berzon, Jeffrey B. Demain, Eileen B. Goldsmith, Danielle E. Leonard and P. Casey Pitts for Defendant and Appellant.

Amy Bisson Holloway and Edmundo Aguilar for State Superintendent of Public Instruction Tom Torlakson as Amicus Curiae on behalf of Defendant and Appellant.

Morrison & Foerster, Miriam A. Vogel, Jack Londen, Sean Gates, Hailly T.N. Korman; ACLU Foundation of Southern California, Mark D. Rosenbaum, David Sapp, Brooks M. Allen; Public Counsel Law Center, Catherine E. Lhamon, Maureen Carroll, Laura Faer and Hernan Vera for Plaintiffs and Respondents.

Horvitz & Levy, Robert H. Wright, Jeremy B. Rosen and Josephine K. Mason for State Senator Bob Huff, State Senator Gloria Romero (Ret.), Democrats for Education Reform, Communities for Teaching Excellence, Families in Schools, Lanai Road Education Action Committee, Reverend Eric P. Lee, Southern Christian Leadership Conference—Los Angeles, Rabbi Ron Stern, Members of the Public Education Advocacy Group of Stephen S. Wise Temple, Adam Kuppersmith, Karen Sykes-Orpe, Matthew J. Orique and Lindi Williams as Amici Curiae on behalf of Plaintiffs and Respondents.

Peter B. Morrison, George C. Fatheree III and Winston P. Hsiao for Certain Individual Members of United Teachers Los Angeles as Amicus Curiae on behalf of Plaintiffs and Respondents.

David R. Holmquist, Alexander A. Molina, Marcos F. Hernandez, Aram Kouyoumdjian; Liebert Cassidy Whitmore, Mary L. Dowell and Meredith G. Karasch for Defendant and Respondent Los Angeles Unified School District.

Kirkland & Ellis, Diana M. Torres and Elisa L. Miller for Defendant and Respondent Partnership for Los Angeles Schools.

## OPINION

**ASHMANN-GERST, J.**—United Teachers Los Angeles (UTLA) appeals a judgment entered upon a consent decree after the trial court conducted a fairness hearing and gave the consent decree final approval.[1] The consent decree was reached between the Los Angeles Unified School District (District), the Partnership for Los Angeles Schools (Partnership) and students (Students) from three of the District's schools (Three Schools)[2] to resolve claims that teacher layoffs had disproportionately and adversely impacted the Students' constitutional and statutory rights to equal educational opportunities, and that additional layoffs would exacerbate the harm. According to UTLA, the consent decree potentially abrogates the seniority rights of its members and it is entitled to a decision on the merits of the Students' claims as a matter of federal due process. In the alternative, it contends that the trial court lacked the authority under Code of Civil Procedure section 664.6 to enter the judgment. We agree on both counts. The judgment is reversed and the matter is remanded for further proceedings.

## FACTS

The Education Code and the collective bargaining agreement between the District and its teachers generally require that when the District reduces its teaching force for budgetary reasons, layoffs must be based on seniority.[3] In the summer of 2009, the District faced a budget shortfall, implemented a reduction in force (RIF) and laid off temporary and probationary teachers. Because the Three Schools employed a high number of new teachers, the 2009 RIF caused the Three Schools to lose up to two-thirds of their teachers. Other schools in the District did not suffer the same fate. For the 2009–2010 school year, vacancies at the Three Schools were filled with substitute teachers. In the spring of 2010, the District again faced a budget shortfall. It proposed a second RIF that would include permanent as well as probationary teachers.

The Students sued the District and the State of California on the theory, inter alia, that RIF's deny them the constitutional right to equal educational

---

[1] A consent decree is no more than a settlement that contains an injunction. (*In re Masters Mates & Pilots Pension Plan* (2d Cir. 1992) 957 F.2d 1020, 1025.)

[2] Two of the Three Schools are operated by the Partnership.

All further statutory references are to the Education Code unless otherwise indicated.

[3] Except as provided by statute, section 44955, subdivision (b) establishes that the services of permanent employees may not be terminated "while any probationary employee, or any other employee with less seniority, is retained to render a service which said permanent employee is certificated and competent to render." Article XIII, paragraph 3.0(b) of the collective bargaining agreement states that the "order of termination [of probationary teachers] . . . shall be based on seniority within status."

opportunities.[4] UTLA and the Partnership were joined as indispensable parties and named as defendants. To prevent further layoffs at the Three Schools, the Students requested a preliminary injunction. After hearing evidence, the trial court found that "[h]igh teacher turnover devastates educational opportunity" and that RIF's have a "real and appreciable impact on [the Students'] fundamental right to equal educational opportunity." The District was preliminarily enjoined from laying off teachers at the Three Schools.

The Students, the District and the Partnership (settling parties) negotiated a consent decree entitled "Intervention Program For Targeted Schools" (consent decree). It contained the following salient terms: (1) targeted schools are defined as (a) 25 schools to be identified by the District using various statistics, (b) up to 20 schools that the District "determines are likely to be negatively or disproportionately affected by teacher turnover," and (c) the Three Schools;[5] (2) in the event of a RIF, the District will skip teachers at the targeted schools; and (3) to minimize negative consequences at other schools as a result of skipping teachers at the targeted schools, the District will ensure that no other school is impacted to a degree greater than the District average.

Over UTLA's objection, the trial court approved the consent decree after conducting a fairness hearing and finding that the consent decree was fair, reasonable and adequate. Judgment was rendered pursuant to the terms of the written order of final approval.

This timely appeal followed.

## DISCUSSION

UTLA and the settling parties agree that the trial court did not decide the merits of the Students' claims and that, for purposes of this appeal, the consent decree potentially affected the seniority rights of UTLA's members. While UTLA argues that it was entitled to a decision on the merits, the settling parties argue that due process was satisfied by the fairness hearing.

The law supports UTLA.

---

[4] The complaint alleged that the District denied the Students equal educational opportunities and other rights guaranteed by Government Code section 11135 as well as article I, section 7, subdivisions (a) and (b), article IV, section 16, subdivision (a), and article IX, sections 1 and 5 of the California Constitution. They requested declaratory and injunctive relief.

[5] The Three Schools were slated to become targeted schools after the preliminary injunction expired on June 30, 2011.

I. *Due process requires a decision on the merits.*

■ The United States Supreme Court has instructed that the contract, statutory or constitutional rights of a party who intervenes or is joined in a lawsuit are entitled to no less respect than the rights asserted by the persons who originated a lawsuit. (*Flight Attendants v. Zipes* (1989) 491 U.S. 754, 765 [105 L.Ed.2d 639, 109 S.Ct. 2732] (*Zipes*).) Thus, in *W. R. Grace & Co. v. Rubber Workers* (1983) 461 U.S. 757, 771 [76 L.Ed.2d 298, 103 S.Ct. 2177] (*W.R. Grace*), the court held that "[a]bsent a judicial determination," the Equal Employment Opportunity Commission and an employer could not "alter [a] collective-bargaining agreement without" an affected union's consent. (*W.R. Grace, supra*, at p. 771.) The court noted that "[p]ermitting such a result would undermine the federal labor policy that parties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored. [Citation.] Although the ability to abrogate unilaterally the provisions of a collective-bargaining agreement might encourage an employer to conciliate with the Commission, the employer's added incentive to conciliate would be paid for with the union's contractual rights." (*Ibid.*) Then, in *Firefighters v. Cleveland* (1986) 478 U.S. 501, 529 [92 L.Ed.2d 405, 106 S.Ct. 3063] (*Local Number 93*), the court held that a trial court's "approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor."[6] In our view, these cases ineluctably establish that neither a consent decree nor a trial court's approval of a consent decree can abrogate a third party's rights. The only permissible inference from these holdings is that a third party is entitled to a decision on the merits. There is no other way for the courts to provide

---

[6] The dissent points out that the court determined that an objecting union received sufficient due process because it was permitted to air its objections to the reasonableness of a consent decree and introduce relevant evidence. (*Local Number 93, supra*, 478 U.S. at p. 529.) In our view, the point is moot as indicated by the following quote from the opinion. "Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor. [Citations.] And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree. [Citations.] However, the consent decree entered here does not bind Local 93 to do or not to do anything. It imposes no legal duties or obligations on the Union at all; only the parties to the decree can be held in contempt of court for failure to comply with its terms. [Citation.] Moreover, the consent decree does not purport to resolve any claims the Union might have under the Fourteenth Amendment . . . or as a matter of contract . . . . Indeed, despite the efforts of the District Judge to persuade it to do so, the Union failed to raise any substantive claims." (*Id.* at pp. 529–530.) Because the union did not raise substantive claims, it had no right to a decision on the merits.

equal respect to settling parties' rights and the rights of nonsettling interveners as the Supreme Court has mandated by its decision in *Zipes*. Our understanding of Supreme Court precedent is bolstered by *Martin v. Wilks* (1989) 490 U.S. 755 [104 L.Ed.2d 835, 109 S.Ct. 2180] (*Martin*). ■ In *Martin*, the court cited *Local Number 93* as support for this statement: "A voluntary settlement in the form of a consent decree between one group of employees and their employer cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of another group of employees who do not join in the agreement. This is true even if the second group of employees is a party to the litigation." (*Martin, supra,* 490 U.S. at p. 768.)

*W.R. Grace, Local Number 93,* and *Zipes* represent the trend regarding the dictates of procedural due process under the federal Constitution. (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; *Moon v. Martin* (1921) 185 Cal. 361, 366 [197 P. 77].) That trend is amplified by lower federal decisions.

In *U.S. v. City of Hialeah* (11th Cir. 1998) 140 F.3d 968, 983 (*Hialeah*), the United States negotiated a consent decree with a city to remedy alleged racial discrimination in the hiring of firefighters and police officers. (*Hialeah, supra,* at p. 971.) The parties to the settlement sought approval based on a prima facie showing of discrimination. The respective unions objected and the district court refused to approve the consent decree because it contained retroactive seniority provisions that conflicted with the employees' contractual seniority rights. (*Ibid.*) The Eleventh Circuit affirmed. It held that case law does not allow "an objecting party's rights to be dispensed with upon nothing more than a prima facie showing of discrimination. Proof at trial is required." (*Id.* at p. 978.)

When deciding *Hialeah,* the Eleventh Circuit relied on the en banc decision of the former Fifth Circuit in *U.S. v. City of Miami, Florida* (5th Cir. 1981) 664 F.2d 435 (*City of Miami*). *City of Miami* held that "a decree disposing of some of the issues between some of the parties may be based on the consent of the parties who are affected by it but that, to the extent the decree affects other parties or other issues, its validity must be tested by the same standards that are applicable in any other adversary proceeding." (*Id.* at p. 436.) It added that a "party potentially prejudiced by a decree has a right to a judicial determination of the merits of its objection" and that those "who seek affirmative remedial goals that would adversely affect other parties must demonstrate the propriety of such relief." (*Id.* at p. 447.) The court reversed

the portion of a consent decree that affected the rights of an objecting party and remanded "for trial of the complaint." (*Id.* at p. 436.)[7]

The consent decree in *City of Miami* contained numerous provisions impacting a city's employees. But the lead opinion left most of those provisions intact because there was no objection or they did not affect the employees represented by the appellant, the Fraternal Order of Police (FOP). Per the lead opinion, the FOP had limited standing to challenge a provision in the consent decree pertaining to promotions. (*City of Miami, supra*, 664 F.2d at p. 445.) Thus, the lead opinion stated: "The provisions of the court's decree shall be modified to provide that it does not affect the promotion of members of the Police Department. As thus restricted, we affirm its reentry upon remand. The case is remanded, in addition, for further proceedings, consistent with this opinion, to determine whether the United States has the right to claim any relief concerning police promotion. If, at trial, the United States can prove that the City has discriminated against black, Spanish-surnamed, or female police officers, or that the City has so discriminated in its employment policy as to prejudice their opportunities for promotion, and that affirmative action in favor of the affected class is appropriate remedial action, the United States may seek such relief, including reimposition of the contents of paragraph 5(c) [of the consent decree]. The FOP shall, of course, be afforded the opportunity either to contend that discrimination, the necessary predicate for relief, has not been proved, or to show that the type of relief embodied in paragraph 5(c) is, in this instance, unnecessary, inadvisable, or unconstitutional." (*Id.* at p. 448.)

Eleven judges concurred in the lead opinion. But they dissented insofar as the lead opinion did not grant the broader relief of reducing the consent decree to a preliminary injunction pending a trial on the merits. In other words, the concurring and dissenting opinion agreed that the FOP was entitled to a trial regarding the promotion provision but disagreed that the rest of the consent decree could be confirmed based on the FOP's lack of standing or objection.[8] (*City of Miami, supra*, 664 F.2d at pp. 448–453 (conc. & dis. opn. of Gee, J.).)

---

[7] The settling parties suggest that the rule in the Fifth Circuit was announced by the court in *Cotton v. Hinton* (5th Cir. 1977) 559 F.2d 1326 (*Cotton*). The suggestion lacks merit. *Cotton* merely held that objecting members of a settling class are entitled to a fairness hearing. (*Id.* at p. 1331.) There was no discussion regarding the abrogation of a nonsettling party's rights. Plus, *Cotton* predated *City of Miami* as well as *W.R. Grace* and *Local Number 93*. We easily conclude that *Cotton*, decided in 1977, fails to shed light on the law in 2012.

[8] The concurring and dissenting opinion eloquently stated: "An appellant is before us complaining that it has had no day in court—has never been set for trial or had notice of a setting—but has been judged away. This error is so large and palpable that, like an elephant standing three inches from the viewer's eye, it is at first hard to recognize. The major dissent is reduced to arguing that it is all right to enter a permanent injunction without a trial against one who is unable, in advance of such a trial, to show the court how his rights will be infringed by

Both *Hialeah* and *City of Miami* require a decision on the merits.

The Ninth Circuit is in accord. In *U.S. v. City of Los Angeles, California* (9th Cir. 2002) 288 F.3d 391, 400 (*City of Los Angeles*), the Ninth Circuit cited *W.R. Grace, Local Number 93, City of Miami*, and *Hialeah* and stated: "Except as part of court-ordered relief after a judicial determination of liability, an employer cannot unilaterally change a collective bargaining agreement as a means of settling a dispute over whether the employer has engaged in constitutional violations." (See *U.S. v. State of Oregon* (9th Cir. 1990) 913 F.2d 576, 582, fn. 4 (*Oregon*) ["If a remedy is sought against a nonconsenting party, the matter must be remanded for trial."].)[9] The Tenth Circuit has followed suit, as demonstrated by *Johnson v. Lodge # 93 of Fraternal Order of Police* (10th Cir. 2004) 393 F.3d 1096, 1109 (*Johnson*). The *Johnson* court cited *Hialeah* and *City of Miami* with approval and stated: "[A] nonconsenting intervenor may block approval of a consent decree only if the decree adversely affects its legal rights or interests. [Citations.]" (*Johnson, supra*, 393 F.3d at p. 1107.) Previously, in *Sanguine, Ltd. v. U.S. Dept. of Interior* (10th Cir. 1986) 798 F.2d 389, 391, the Tenth Circuit held that if an objecting union's rights are "resolved by consent decree and not adversary litigation, [the] case presents a unique situation in which prejudice to the [union] can be avoided only by setting aside the prior judgment and allowing the opportunity to litigate the merits of the case."

In *Kirkland v. New York State Dept. of Correctional Services* (2d Cir. 1983) 711 F.2d 1117, 1126–1127 (*Kirkland*), the Second Circuit cited *City of Miami* with approval. And in *Wilder v. Bernstein* (S.D.N.Y. 1986) 645 F.Supp. 1292 (*Wilder*), the district court cited *Local Number 93* and stated that parties who choose to resolve litigation through settlement may not dispose of the claims of a third party without its consent. (*Wilder, supra*, at p. 1318.) Recently,

---

the order. Here is new law indeed, law that we cannot accept. [¶] And while it is well and very well to extoll the virtues of concluding Title VII litigation by consent, as do our brethren—a sentiment in which we concur—we think it quite another to approve ramming a settlement between two consenting parties down the throat of a third and protesting one, leaving it bound without trial to an agreement to which it did not subscribe. If this be permitted, gone is the protester's right to appear in court at a trial on the merits, present evidence, and contend that the decree proposed is generally infirm—as imposing unconstitutional or illegal exactions—so that it should not be entered at all or so as to bind any party or affected third party. Who can know what the protester might have been able to show at such a hearing, one to which first-reader principles of procedural due process entitle it? Surely, whether or not it had the power to persuade the trial court, it had the right to try." (*City of Miami, supra*, 664 F.2d at pp. 451–452 (conc. & dis. opn. of Gee, J.), fn. omitted.)

[9] *Alaniz v. California Processors, Inc.* (N.D.Cal. 1976) 73 F.R.D. 289, 293, cited by the settling parties, held that the seniority rights of nonsettling employees could be compromised based on a prima facie showing of discrimination against the plaintiffs in a title VII action. That holding was nullified by *W.R. Grace, Local Number 93*, and Ninth Circuit opinions such as *City of Los Angeles*.

citing *Martin* and *Local Number 93*, the Second Circuit stated: "[I]t is well settled that no voluntary settlement—whether entered as a consent decree, approved under [Federal Rules of Civil Procedure] Rule 23(e), or agreed to in private—can dispose of the claims of a non-consenting third party." (*U.S. v. Brennan* (2d Cir. 2011) 650 F.3d 65, 118 (*Brennan*).) Thus, based on *Kirkland, Wilder* and *Brennan*, it is fair to say that the Second Circuit also interprets that law as requiring a decision on the merits.

Prior to *W.R. Grace* and *Local Number 93*, the rule in the Seventh Circuit was that a consent decree could abridge the preexisting rights of third parties. (*Metropolitan Housing v. Village of Arlington Heights* (N.D.Ill. 1979) 469 F.Supp. 836, 851–852; *Equal Employment Opportunity Com. v. American Telephone & Telegraph Co.* (3d Cir. 1977) 556 F.2d 167 [a consent decree can affect third party rights]; *Airline Stewards, Etc. v. American Airlines* (7th Cir. 1978) 573 F.2d 960, 964 [the district court did not have a duty to litigate the merits of the plaintiffs' claims prior to approving a settlement that impacted the rights of other individuals].) Then, in 1992, the Seventh Circuit cited *W.R. Grace, Local Number 93* and other cases and stated that " 'parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement.' [Citation.] [Citations.] In particular, they may not alter collective bargaining agreements without the union's assent. [Citation.] Neither may litigants agree to disregard valid state laws. [Citations.]" (*People Who Care v. Rockford Bd. of Education* (7th Cir. 1992) 961 F.2d 1335, 1337 (*People Who Care*).) Ultimately, the Seventh Circuit held that "before altering the contractual (or state-law) entitlements of third parties, the court must find the change necessary to an appropriate remedy for a legal wrong. Even if this finding may come on abbreviated proceedings (a subject we have not decided), there must be such a finding." (*Id.* at p. 1339.) In *People Who Care*, the Seventh Circuit did not specify the nature of the proceeding required for abrogating a third party's rights. Nonetheless, it is in line with *W.R. Grace* and *Local Number 93* insofar as it requires a finding of a legal wrong and therefore necessarily requires a decision on the merits of the plaintiff's claims.

The settling parties argue that multiple lower federal cases have interpreted the due process clause as requiring much less than *Hialeah* and *City of Miami*. Based on our reading, we cannot concur.

In *Dennison v. Los Angeles Dept. of Water & Power* (9th Cir. 1981) 658 F.2d 694 (*Dennison*), an employee sued an employer for race discrimination on behalf of himself and other minority employees. The parties negotiated a consent decree that required the employer to implement an affirmative action program. After a fairness hearing, and after the district court heard the

views of an objecting union, the consent decree was approved. Subsequently, the union sued the employer to recover compensation for nonminority employees who were denied promotions because of the consent decree. The district court granted summary judgment for the employer. The Ninth Circuit affirmed the summary judgment and upheld "the district court's decision on the ground that the present action is an impermissible collateral attack." (*Id.* at p. 695.) In addition, the court noted that "the [f]airness [h]earing held before the consent decree was formally adopted adequately afforded the union an opportunity to present to the court its view of the adverse impact of the decree on non-minority employees." (*Id.* at p. 696.)

Two reasons dissuade us from reading *Dennison* as permitting a trial court to abrogate a nonsettling party's contractual or statutory rights based upon a mere finding that a consent decree is fair. To begin with, it predates *W.R. Grace* and *Local Number 93* and those cases are controlling. Additionally, the consent decree in *Dennison* did not abrogate specific and affirmative contractual or statutory promises of promotion that had been given to the nonminority employees through a collective bargaining agreement or by a legislative body. In other words, they did not possess a legally enforceable right to receive promotions. At most, the nonminority employees had an expectation of receiving promotions under a discriminatory practice. (See *Vanguards of Cleveland v. City of Cleveland* (6th Cir. 1985) 753 F.2d 479, 484–485 ["Since non-minorities do not have a legally protected interest in promotions which could only be made pursuant to discriminatory employment practices, it follows that the legal rights of non-minorities will not be adversely affected by *reasonable* and *lawful* race-conscious hiring or promotional remedies."].) Here, subject to exception, UTLA's members were granted seniority rights by contract and statute. Those rights are not on par with the expectation of the nonminorities in *Dennison*.

*Johnson* held that a union lodging an objection to a consent decree was entitled to nothing more than a fairness hearing. (*Johnson, supra,* 393 F.3d at p. 1096.) The consent decree in that case, however, did not alter the union's contractual rights, and the court therefore held that *W.R. Grace* did not require a judicial determination. (*Johnson, supra,* at pp. 1105, 1109.) The court recognized two distinct rules. Number one, an objecting party without any rights at stake " 'is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, [but] it does not have power to block the decree merely by withholding its consent.' [Citation.]" (*Id.* at p. 1107.) Number two, "a consent decree may not impose duties or obligations on an intervenor that does not consent to settlement, nor dispose of valid claims the party has under the Constitution, a statute, or contract. [Citation.]" (*Ibid.*) While the facts of *Johnson* invoked the former rule, the facts of this case invoke the latter. Subsequently decided cases can be similarly parsed.

The *Oregon* court held that the district court did not have to conduct a full evidentiary hearing before approving a conservation plan akin to a consent decree. But *Oregon*, like *Johnson*, involved a settlement that did not abrogate the contractual rights of third parties. (*Oregon, supra*, 913 F.2d at pp. 582–583 & fn. 6 [the objecting parties asserted an interest in preserving natural resources].) *U.S. v. Comunidades Unidas Contra la Contaminacion* (1st Cir. 2000) 204 F.3d 275, 279 (*Comunidades*) falls into the same camp. The trial court did not have to hold an evidentiary hearing because the objecting party only claimed that an environmental consent decree did not sufficiently protect the environment. (*Ibid.*) *Oregon* and *Comunidades* do not apply when contractual or statutory rights are at stake.

An intervener objected to a class action settlement in *Lelsz v. Kavanagh* (N.D.Tex. 1991) 783 F.Supp. 286 (*Lelsz*) and appealed when the settlement was approved. *Lelsz* acknowledged that pursuant to *Local Number 93*, parties who settle litigation " 'may not dispose of the claims of a third party . . . without that party's agreement.' [Citation.]" (*Lelsz, supra*, at pp. 291–292.) Despite that rule, the intervener lost on appeal. The intervener was permissive and it was "not at all clear" what contractual interests or rights the intervener was asserting. (*Id.* at p. 293.) The court held that the intervener was not entitled to block the settlement because it did not have a sufficiently strong interest under *Local Number 93* and *Zipes*. (*Lelsz, supra*, at p. 294 ["[the intervener's] interest in the Implementation Agreement alone, though it entitles [the intervener] to be heard on the reasonableness and legality of the settlement, is not so strong as to require its consent to the settlement"].) Thus, the district court recognized that a sufficiently strong interest required a different procedure than a fairness hearing. It bears pointing out, as well, that the *Lelsz* court is in the Fifth Circuit. As a district court, it was bound by the Fifth Circuit's decision in *City of Miami*. There is no suggestion in *Lelsz* that it was purporting to depart from precedent.

When the First Circuit decided *Durrett v. Housing Authority of City of Providence* (1st Cir. 1990) 896 F.2d 600 (*Durrett*), it cited *City of Miami* and stated that "if third parties will be affected" by a settlement, the court must ensure "that it will not be unreasonable or legally impermissible as to them. [Citation.]" (*Durrett, supra*, at p. 604.) Nonetheless, *Durrett* reversed an order denying approval of a proposed consent decree because, in part, "[n]o protesting third parties have appeared" and there was "no suggestion, or basis for one, that the proposed [consent] decree would violate any law." (*Ibid.*) *Durrett* cannot be read as disagreeing with the holdings of the Supreme Court or other circuits.

█ Simply put, the settling parties have not cited any lower federal decisions that change our perception of the trend as stated in *W.R. Grace* and

*Local Number 93.* Even if case law did not establish a trend, we would adopt the reasoning of *Hialeah* and *City of Miami* as the law of California because those cases properly recognized that the rights of a nonsettling party should be given no less respect than the rights of parties who negotiate a consent decree. In other words, all parties should have the right to either voluntarily compromise a claim or litigate.

## II. *The trial court did not decide the merits at the fairness hearing.*

■ Though the parties agree that a fairness hearing is not a decision on the merits, it is important to contextualize the nature of the fairness hearing that transpired below. As noted by Justice Rehnquist in his dissent in *Ashley v. City of Jackson, Miss.* (1983) 464 U.S. 900, 902 [78 L.Ed.2d 241, 104 S.Ct. 255] (dissenting from the denial of certiorari), "The central feature of any consent decree is that it is not an adjudication on the merits. The decree may be scrutinized by the judge for fairness prior to his approval, but there is no contest or decision on the merits of the issues underlying the lawsuit." The Ninth Circuit, in *Oregon*, explained that at a fairness hearing, the court "should not determine [the] contested issues of fact that underlie the dispute." (*Oregon, supra,* 913 F.2d at p. 582.)[10] A review of the California Rules of Court and relevant case law prove that this is the rule in our state.

■ Parties who settle a class action may move the trial court for preliminary approval of the settlement. (Cal. Rules of Court, rule 3.769(c).) If preliminary approval is granted, the trial court must order that notice of the final approval hearing be given to members of the class. (Cal. Rules of Court, rule 3.769(e).) Before final approval can be granted, the trial court must first conduct an inquiry into the fairness of the proposed settlement. (Cal. Rules of Court, rule 3.769(g).)

■ The trial court has broad discretion to determine whether a class action settlement is fair. It should consider factors such as the strength of the plaintiffs' case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status through trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 581 [112

---

[10] *City of Miami* succinctly explained that "the agreement of the parties is not equivalent to a judicial decision on the merits. It is not the result of a judicial determination after the annealment of the adversary process and a judge's reflection about the ultimate merits of conflicting claims. It does not determine right and wrong in the initial dispute. Forged by the parties as a compromise between their views, it embodies primarily the results of negotiation rather than adjudication." (*City of Miami, supra,* 664 F.2d at p. 440.)

Cal.Rptr.3d 27] (*Nordstrom*); *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 [56 Cal.Rptr.2d 483].) But the "list of factors is not exclusive and the court is free to engage in a balancing and weighing of factors depending on the circumstances of each case. [Citation.]" (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 245 [110 Cal.Rptr.2d 145] (*Wershba*).) In sum, the trial court must determine that the settlement was not the product of fraud, overreaching or collusion, and that the settlement is fair, reasonable and adequate to all concerned. (*Nordstrom, supra*, at p. 581.)

 The burden is on the proponent of the settlement to show that it is fair and reasonable. (*Wershba, supra*, 91 Cal.App.4th at p. 245.) However, there is a presumption of fairness when (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the trial court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small. (*Ibid.*)

Consistent with these rules, the lengthy written order (order) after the fairness hearing confirms that the trial court issued a discretionary ruling on the fairness of the consent decree and did not decide the merits.

The order explained that the fairness hearing took place over a four-day period. The parties presented live testimony from eight witnesses; submitted 30 declarations and 15 depositions from District administrators, UTLA members, UTLA officers and expert witnesses; and entered numerous documents into evidence. Based on the record, the trial court determined that the consent decree was fair, reasonable and adequate, and it granted final approval. In support, the trial court made the following factual and legal findings: (1) the California Constitution guarantees to all public school students a fundamental right to basic equality of educational opportunity; (2) in a budget-based RIF, permanent teachers must be laid off in reverse order of seniority, but deviation is allowed pursuant to section 44955, subdivision (d)(2) for the purpose of maintaining or achieving compliance with equal protection; (3) the layoff of probationary teachers is governed by the collective bargaining agreement, and the collective bargaining agreement implicitly incorporates the principle of equal protection; (4) to approve a consent decree, a trial court need not make findings on the underlying claims, and its determination at a fairness hearing is nothing more than an amalgam of delicate balancing, gross approximation and rough justice; (5) if a consent decree is presumptively valid, an objecting party has the burden of proving that its legal rights are adversely affected and the settlement is unreasonable; (6) the consent decree negotiated by the settling parties meets the criteria for being presumptively fair; and (7) viewed in the limited posture of a fairness hearing in which the consent decree is presumed fair, the evidence shows that the District violated the California Constitution by failing to provide an

adequate basic public education at the Three Schools, and also that constitutional violations are likely to occur at other schools within the District.

III. *The trial court must determine the merits of the Students' claims.*

■ When a RIF occurs, permanent teachers must be terminated in "the inverse of the order in which they were employed." (§ 44955, subd. (c).) The collective bargaining agreement provides the same for probationary teachers. A trial court may alter those seniority rights, but only if there is a proper legal basis. (§ 44955, subd. (d)(2) [the seniority system for permanent teachers can be altered "[f]or purposes of maintaining or achieving compliance with constitutional requirements related to equal protection of the laws"]; *W.R. Grace, supra*, 461 U.S. at p. 766 ["[a]s with any contract . . . , a court may not enforce a collective-bargaining agreement that is contrary to public policy"].) UTLA's members are prejudiced by the consent decree because it would alter the system for RIF's by requiring the District to skip certain less senior teachers and lay off more senior teachers. ■ Because the trial court never decided the merits of the Students' claims, it erred when it approved the consent decree and entered judgment against UTLA. The matter must be remanded. (*City of Miami, supra*, 664 F.2d at p. 447 ["[a] party potentially prejudiced by a [consent] decree has a right to a judicial determination of the merits of its objection"].)

IV. *Code of Civil Procedure section 664.6.*

Even if federal due process allowed the trial court to abrogate the rights of teachers with no more than a fairness hearing, state law does not.

■ At base, the Students' motion for approval of the consent decree was a motion to enforce it, i.e., to render the consent decree binding on all of the parties to the litigation. In *Levy v. Superior Court* (1995) 10 Cal.4th 578 [41 Cal.Rptr.2d 878, 896 P.2d 171] (*Levy*), our Supreme Court explained that the methods for enforcing a settlement are a motion for summary judgment, a separate suit in equity, an amendment to the pleadings in the settled action or a motion under Code of Civil Procedure section 664.6. (*Levy, supra*, 10 Cal.4th at p. 586, fn. 5.) The Students did not obtain judgment through summary judgment. Nor did they obtain a judgment in connection with a separate suit in equity or through an amendment to the pleading (which, of course, would later be subject to proof). Thus, the only possible authority for the judgment entered was Code of Civil Procedure section 664.6.

Code of Civil Procedure section 664.6 provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof,

the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement." The "term 'parties' as used in section 664.6 . . . means the litigants themselves." (*Levy, supra*, 10 Cal.4th at p. 586.) An agreement cannot be enforced pursuant to section 664.6 against a litigant who did not sign it or stipulate orally before the court. (*Ibid.*; *Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 306 [87 Cal.Rptr.2d 822] ["We simply hold the section's requirement of a 'writing signed by the parties' must be read to apply to all parties bringing the section 664.6 motion and against whom the motion is directed."].)

██ When interpreting a statute, we must ascertain the Legislature's intent. (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2012) 203 Cal.App.4th 1328, 1338 [138 Cal.Rptr.3d 24].) "In ascertaining that intent, a court must ' "first turn[] to the words used. [Citation.] [¶] When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citations.]" [Citation.]' [Citation.]" (*Ibid.*) ██ Code of Civil Procedure section 664.6 applies to "pending litigation." (§ 664.6.) There is no qualification in the language. It applies to class actions.

The Students and District read Code of Civil Procedure section 664.6 differently. They argue that under its plain language, section 664.6 "defines when parties may opt to have the trial court reserve jurisdiction over performance of a settlement agreement." Thus, they contend that the statute only pertains to the retention of jurisdiction. But, undeniably, the statute also defines when a trial court "may enter judgment pursuant to the terms of the settlement." (Code Civ. Proc., § 664.6.) We have no power to ignore the Legislature's plain and direct statutory language.

██ In addition to the foregoing, we conclude that parties to pending litigation in a class action refers to the class representatives and the opposing parties but does not include the unnamed class members. ██ Our interpretation hews to the rule that we must "avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend. [Citations.]" (*People v. Mendoza* (2000) 23 Cal.4th 896, 908 [98 Cal.Rptr.2d 431, 4 P.3d 265].) If we interpreted Code of Civil Procedure section 664.6 as requiring all class members to consent in writing or before the trial court, the requirement would be so daunting that class actions would probably not settle.

Here, UTLA did not sign the consent decree. Therefore, the consent decree cannot be enforced against UTLA or any of the teachers and the judgment was improper.

According to the Students and the District, UTLA's contention that the judgment is not proper under Code of Civil Procedure section 664.6 has no merit because the trial court properly entered judgment pursuant to the process contemplated by California Rules of Court, rule 3.769. Specifically, they argue that the "process is distinguishable from the procedures required by [Code of Civil Procedure] section 664.6. A judgment entered pursuant to [Code of Civil Procedure] section 664.6 is a ministerial act done according to the terms of the agreement. The [j]udgment entered here was accomplished upon the court's approval after a four-day evidentiary hearing. This [j]udgment was pursuant to judicial action and involved more than simply entering the terms of the settlement."

We disagree.

■ California Rules of Court, rule 3.769 provides in part: "If the court approves the settlement agreement after the final approval hearing, the court must make and enter judgment." (Cal. Rules of Court, rule 3.769(h).) The problem for the Students and District is that this rule does not contemplate approval of a class action that abrogates the rights of nonsettling parties. This conclusion is easily drawn from the fact that the rule requires notice of the final approval hearing to class members but not any other person whose rights might be compromised. (Cal. Rules of Court, rule 3.769(f).) The reason is easy to surmise. This rule was designed to protect absent class members against class attorneys and class representatives failing to adequately represent the class. Moreover, it is the rare class action settlement that abrogates a nonsettling party's contractual or statutory rights. Based on these two facts, we conclude that when the Judicial Council promulgated California Rules of Court, rule 3.769, it did not contemplate that the rights of nonsettling parties would be implicated.

Despite the foregoing, the Students and District suggest that California Rules of Court, rule 3.769 either trumps Code of Civil Procedure section 664.6 or that the statute simply does not apply to class action settlements. To support this view, they neither engage in statutory interpretation nor cite to any legislative history with respect to Code of Civil Procedure section 664.6. Rather, they contend that the last word on the topic is set forth in the August 12, 2008, report of the Civil and Small Claims Advisory Committee (August 12, 2008, Report) to the Judicial Council. In that report, the committee proposed amendments to California Rules of Court, rules 3.769 and 3.770 "to provide that on the approval of a class settlement and entry of judgment, a court may not also enter dismissal of the action." (Aug. 12, 2008, Rep., p. 1.) As we elucidate below, the August 12, 2008, Report does not impact our interpretation of the law.

In the rationale for the proposed amendments, the report stated that the "[r]etention of jurisdiction to enforce a settlement in a non-class action case

is governed by Code of Civil Procedure section 664.6" and noted that *Wackeen v. Malis* (2002) 97 Cal.App.4th 429, 439 [118 Cal.Rptr.2d 502] (*Wackeen*) held that a trial court could retain jurisdiction to enforce the terms of an approved settlement even after dismissal. (Aug. 12, 2008, Rep., p. 2.) "The court's holding in *Wackeen* . . . has not been applied to a class settlement in a published opinion. Unlike a nonrepresentative action, in a class action, because of the need to protect the absent class members who did not participate in settlement negotiations, the settlement terms are reflected in the judgment when the court approves the class settlement, and it is not necessary in a class settlement for the parties to ask the court to retain jurisdiction to enforce the court-approved settlement terms" because that is already required by California Rules of Court, rule 3.769(h). (Aug. 12, 2008, Rep., p. 2.) "Moreover, a typical nonrepresentative action does not require court approval of a settlement because all the parties to the settlement are before the court and their settlement may be enforced as any other private contractual agreement may be enforced. [¶] The purpose of requiring court approval of a class settlement and court approval of the dismissal of a class action is to protect the interests of the class and its members. [Citations.] Rules prohibiting the concurrent entry of judgment following settlement with retention of jurisdiction and entry of dismissal will advance this purpose." (Aug. 12, 2008, Rep., p. 3.)

 The August 12, 2008, Report does not interpret Code of Civil Procedure section 664.6, nor does it conclude that California Rules of Court, rule 3.769 controls in a class action. Even if it had expressed the view that the rule controls over the statute, it would not matter. First, the text of California Rules of Court, rule 3.769 does not contain language providing that section 664.6 is inapplicable to class actions. Second, as our Supreme Court held in *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 532 [117 Cal.Rptr.2d 220, 41 P.3d 46], "[r]ules promulgated by the Judicial Council may not conflict with governing statutes. [Citation.] If a rule is inconsistent with a statute, the statute controls. [Citation.]" (See *People v. Hall* (1994) 8 Cal.4th 950, 963 [35 Cal.Rptr.2d 432, 883 P.2d 974].) Thus, if California Rules of Court, rule 3.769 expressly or impliedly allows entry of judgment against a nonsettling party pursuant to a settlement agreement, then that portion of it conflicts with Code of Civil Procedure section 664.6 and is invalid.

 In any event, we do not read California Rules of Court, rule 3.769 in a manner that is incompatible with Code of Civil Procedure section 664.6. The rule simply provides a procedure for protecting absent class members and therefore controls the approval of a class action settlement, but the trial court's power to enter judgment after approval of a class action settlement derives from the statute. It is true that California Rules of Court, rule 3.769(h) calls for entry of judgment after approval. That rule, however, did not create

the trial court's power to enter judgment. Rather, the rule reflects the Judicial Council's instruction on employing that power.

All other issues raised by the parties are moot.

## DISPOSITION

The judgment is reversed and remanded.

UTLA shall recover its costs on appeal.

Chavez, J., concurred.

**DOI TODD, Acting P. J.,** Dissenting.—I dissent. The majority has adopted the position advocated by United Teachers Los Angeles (UTLA), concluding there was an insufficient legal basis to modify teacher seniority rights because the trial court did not adjudicate the merits of the constitutional claims brought by plaintiffs Sharail Reed and others (Students). The majority finds that a merits determination was necessary because the trial court's fairness hearing resulted in an impact to UTLA's rights without sufficient due process. In my view, this conclusion is not supported by the record or the law. Central to the constitutional right to due process is the "guarantee that 'absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard.' [Citations.]" (*Salas v. Cortez* (1979) 24 Cal.3d 22, 27 [154 Cal.Rptr. 529, 593 P.2d 226].) Here, UTLA actively participated in the matter as an intervening defendant, took and obtained discovery from other parties, examined and cross-examined witnesses during a four-day fairness hearing, submitted briefs and oral argument on its position and received a judicial determination finding that constitutional violations necessitated the consent decree and overruling its objections thereto on the merits. Under these circumstances, UTLA was heard and its due process rights were satisfied. The law does not require more.

## I. *Procedural History.*

### A. *Pleadings and Preliminary Injunction.*

The Students represented all students attending three schools (Three Schools) in the Los Angeles Unified School District (District) that had been significantly impacted by seniority-based teacher layoffs occurring in 2009. Because of budgetary shortfalls, the District proposed another layoff, or reduction in force (RIF), in 2010 that would likewise disproportionately affect the District's struggling schools that tended to employ low-seniority teachers.

In February 2010, the Students filed their initial complaint against the District and the State of California, alleging that the 2009 RIF had caused the Three Schools to lose between one-half to two-thirds of their teachers, and that the lack of a stable and experienced corps of teachers denied them their constitutional right to an equal educational opportunity.

After two amendments to the complaint and after the Students had moved for a preliminary injunction, the trial court sustained the District's demurrer with leave to amend on the ground that the Students had failed to join UTLA as an indispensable party. Observing that "[i]t may well be that the current seniority system, which is a contractual obligation as between [the District] and UTLA, will have to be abrogated or modified if the plaintiffs show that they are otherwise entitled to relief," or that "[p]erhaps the Education Code provides a legal basis to abrogate [the District's] contractual obligations with UTLA (which are separate from and cumulative to its obligations to teachers under statutes), . . . UTLA should have proper notice and an opportunity to be heard before any such action is taken by this Court." Thereafter, in April 2010 the Students joined UTLA as a defendant to the action.

From that point on, UTLA participated in the action as a party. It answered the complaint, filed objections to the motion for a preliminary injunction and responded to inquiries from the trial court in connection with the tentative ruling on the motion for a preliminary injunction. Following a two-day hearing in May 2010—which included testimony and the submission of exhibits and declarations—the trial court found that RIF-induced teacher turnover had and would continue to have a disparate negative impact on the Three Schools that was not justified by a compelling interest. Rather, the trial court reasoned that the Education Code expressly qualified teacher seniority rights by permitting "a school district to 'deviate from terminating a certificated employee in order of seniority for purposes of maintaining or achieving compliance with constitutional requirements related to equal protection of the laws.' [Ed. Code], § 44955(d)(2). The plain language of this statute clearly applies to a situation in which layoffs would result in a violation of students' equal protection rights."[1] Likewise, the trial court found a student's constitutional right to an equal educational opportunity necessarily incorporated into any contract-based seniority right, reasoning: "The Legislature clearly qualified teachers' interests in seniority-based layoffs to accommodate constitutional equal protection interests. This principle is implicitly incorporated in the CBA [(collective bargaining agreement)]; [the District] could not bargain away students' constitutional rights. In other words, teachers do not have a vested interest in the application of seniority in a layoff that will result in an equal protection violation and a school district does not have discretion to violate students' fundamental right to equal educational opportunity."

---

[1] Unless otherwise indicated, further statutory references are to the Education Code.

Accordingly, the trial court enjoined the District from implementing any budget-based layoffs at the Three Schools and directed that the classroom teachers currently assigned to the Three Schools be "skipped" in the layoff process as permitted by section 44955, subdivision (d)(2). UTLA did not appeal this ruling.

B. *Preliminary Approval of the Consent Decree.*

At the trial court's urging, the parties negotiated regularly beginning in May 2010 until they reached a settlement in October 2010. UTLA participated in some but not all of the settlement discussions and received a first draft of the proposed settlement in July 2010. After the District's board voted to approve the settlement in October 2010, UTLA rejoined the settlement discussions, participating in four sessions in October 2010. In early November 2010, the trial court lifted an informal stay on discovery to enable the parties to obtain facts regarding the fairness of the settlement.

The settlement agreement, captioned "Intervention Program for Targeted Schools" (consent decree), defined " 'targeted schools,' " obligated the District to implement measures designed to stabilize and improve the targeted schools in order to prevent further equal protection violations and included measures to ensure that schools outside the targeted schools were not disproportionately impacted. The targeted schools were comprised of three categories. First, they were made up of the 25 schools API-ranked (Academic Performance Index) one to three with the highest " 'teacher turnover rate' "—defined as the year-to-year attrition of teachers, including RIF-based attrition, calculated as of September 1 each year—based on a three-year average, which were also demonstrating growth based on multiple identifiable statistical measures. Second, they included up to 20 " 'new schools' "—that is, those established within the prior two years—that the District would determine in its discretion based on historical data were likely to be negatively and disproportionately affected by teacher turnover. Finally, the targeted schools included the Three Schools for a finite time period; they could then be considered under the criteria specified in the first and second categories.

UTLA did not object to the majority of the consent decree. Its challenge was limited to the application of paragraph 2(a) to targeted schools beyond the Three Schools. Paragraph 2(a) provided: "<u>Protection from RIF</u>. In the event of a RIF, the District will skip teachers at targeted schools. In order to minimize negative consequences at other schools as a result of skipping the up to 45 schools defined herein, the District will ensure that no other school is impacted greater than the District average." In November 2010, UTLA filed written opposition to the motion seeking approval of the consent decree on the grounds the consent decree would effectively abrogate both portions of

the collective bargaining agreement (CBA) between it and the District, and its rights under the Education Code.

In its tentative ruling preliminarily approving the consent decree, the trial court acknowledged that "UTLA raises many serious issues which merit careful consideration at the final approval hearing, but the mere existence of such concerns and objections is not, necessarily, a basis to deny preliminary approval." By order dated December 15, 2010, the trial court conditionally approved the consent decree and conditionally certified a class comprised of students attending the Three Schools during specified time periods. It approved the form of notice, set the matter for a formal fairness hearing and set deadlines for briefing and the exchange and submission of evidence. As part of its tentative ruling, which it expressly incorporated into its order granting preliminary approval, the trial court noted "that UTLA is correct that it is entitled to fully participate as a party and that failure to allow such an opportunity might well void any court-approved settlement, but exactly that right has been extended to UTLA for months since the Court early on directed plaintiffs to name and serve UTLA. The right to participate is not the same thing as a veto right, and UTLA presently does not have causes of action of its own pending which require adjudication before any final approval might be granted."

C. *The Fairness Hearing and Final Approval of the Consent Decree.*

Following preliminary approval, all parties engaged in what the trial court characterized as "full and robust discovery," which included propounding and responding to interrogatories, requests for production of documents and requests for admission; and taking the depositions of numerous fact and expert witnesses.

A four-day fairness hearing commenced on January 18, 2011. Four attorneys appeared on behalf of UTLA. During the evidentiary hearing, eight witnesses (including four experts) testified, the trial court admitted approximately 30 declarations pursuant to a stipulation, the parties designated and lodged 15 deposition transcripts and the trial court received approximately 70 exhibits into evidence. Throughout the proceeding, UTLA repeatedly advocated its position that the consent decree was unfair because it was in conflict with teacher seniority rights and there was insufficient evidence that such a remedy was necessary at targeted schools other than the Three Schools. At the conclusion of the hearing, the trial court granted final approval of the consent decree. As part of its ruling, it specifically addressed UTLA's objections, stating: "I don't think I'm adjusting the collective bargaining agreement according to its terms as to the permanent teachers whose rights were never better than the rights given to them by the Legislature under the

controlling provisions of Education Code section 44955, which has always been limited by (d)(2), as well as by (d)(1), since contrary to the arguments of UTLA and the District, I have found (d)(2) to include the cognizable rights of students to their equal protection rights under the state Constitution. The permanent teachers have never had a right to have their seniority control if the effect of that is to produce deprivation of an enrolled student's fundamental right, which is in the nature of an equal protection right and, therefore, I don't believe that the consent decree settlement agreement proposed to me actually is in derogation of the contractual rights of the teachers."

Thereafter, in February 2011, the trial court issued findings of fact and conclusions of law. Acknowledging that it had viewed the evidence to determine the fairness of the consent decree and not to adjudicate that matter for the purpose of fashioning a judicial remedy, the trial court cited the comments it made at the end of the hearing and concluded "the evidence shows that 'there is in fact a failure to provide an adequate basic public education' both as to the three Plaintiffs' schools and as to 'some universe that encompasses 45 schools and more.' [Citation.] Based on the evidence described herein, the Court concludes that 'there is an adequate factual basis on which the Court can anticipate . . . [t]hat there are similar constitutional violations to those of the three schools, which are foreseeable, indeed already extant.' [Citation.] [¶] The evidence supports the 'factual conclusion that additional turnover at the 45 schools as defined, will cause material harm to faculty stability and the ability to deliver basic education.' [Citation.] The data make clear that 'high turnover in a tough environment only correlates to bad results. And the bad results here that are presently occurring are of such a gravity as to be tantamount to being the equivalent of a constitutional violation.' [Citation.] The Court is convinced that 'we should not intentionally administer more disruption when the schools basically are already so discombobulated that they don't seem to be able to work.' [Citation.]"

The trial court analyzed four interrelated categories of evidence which it found supported its conclusion "that in future seniority-based layoffs, constitutional violations may fairly be anticipated at [District] schools other than Plaintiffs' three schools. The Settlement Agreement provides a reasonable means to identify constitutionally vulnerable schools. The Agreement will prevent further constitutional violations, provide necessary resources, and help to provide the stability necessary to reform struggling schools."

First, the trial court determined that the District had difficulty in providing educational opportunities to all of its students and that the evidence tended to show constitutional violations were occurring at more than merely the Three Schools. It relied on testimony showing that one-half of the District's schools were ranked in the bottom 30 percent of schools statewide in terms of

academic performance, and specifically cited evidence of exceedingly low proficiency scores at two District schools other than the Three Schools. It also cited testimony from then incoming superintendent John Deasy "that 'dozens and dozens' of schools are not providing all students with equal educational opportunity and . . . that 45 schools is 'a drop in the bucket' in comparison to the number of schools that could benefit from the protection."

Second, the evidence showed an exceptionally high teacher turnover rate among District schools and further established that high teacher turnover devastates educational opportunity in multiple ways. The trial court summarized the undisputed testimony of experts, administrators and teachers demonstrating that high teacher turnover correlated to the misassignment of teachers and placement of teachers lacking full credentials; led to the increased use of short- and long-term substitute teachers; precluded the development of a stable support infrastructure necessary for the quality delivery of educational content; and inhibited the development of student-teacher relationships that are often critical to positive academic achievement. The evidence also showed a correlation between high teacher turnover and low standardized test scores. As one expert testified, high achievement did not exist without high stability.

Third, the trial court acknowledged that while high teacher turnover has multiple causes, the evidence established that budget-based layoffs served to exacerbate turnover, thereby leading to a constitutional violation. Even UTLA's expert conceded "that schools with high teacher turnover can fall into a 'vicious cycle' in which the high turnover itself makes it more difficult to recruit and retain teachers, contributing to continued high turnover." The trial court cited evidence showing the specific impact of RIF's at the District's struggling schools: District "teachers and administrators testified that layoffs caused their schools to lose teachers committed to their schools [citation], that committed teachers were forced to leave the District [citation], that current teachers are considering leaving the District because of the high likelihood of another round of layoffs [citation], and that those teachers who sacrificed by staying as long-term substitutes are likely to leave because the loss of income and benefits make[s] the position untenable [citation]." Administrators from the Three Schools and other District schools described the difficulties they had in filling RIF-created vacancies with qualified teachers. The trial court expressly found "entirely unpersuasive" evidence offered by UTLA that experienced teachers placed at struggling schools showed commitment to students, sought professional development, exhibited the necessary competencies and left those schools for reasons other than their placements were ill-fitting.

Finally, the trial court found the District's evidence showed that teacher layoffs disproportionately affected the District's academically struggling

schools—those in the bottom 30 percent of API-ranked schools statewide. The evidence likewise confirmed that future layoffs would continue to disproportionately impact the District's most struggling schools.

The trial court determined the totality of the evidence showed "that students in Plaintiffs' schools suffer significant constitutional injury from the imposition of a Reduction in Force. In addition, the evidence shows that other students in other schools are also predisposed, because of current conditions in their schools, to much greater injury from a Reduction in Force." It ruled that because "the evidence adequately supports the conclusion that additional turnover, caused by a Reduction in Force, at the targeted schools would cause material harm to faculty stability and the ability to deliver basic educational opportunity to the students in the schools," it would approve the consent decree as a fair and reasonable means to prevent layoffs from contributing to a constitutional violation.

### D. *Analysis of Impact on Teacher Seniority Rights.*

A significant component of the trial court's findings of fact and conclusions of law addressed UTLA's claim that the trial court could not approve the consent decree absent a finding following a full trial or summary judgment that there were constitutional violations at each of the targeted schools. Preliminarily, the trial court reiterated its prior conclusion that teacher seniority rights afforded by statute or contract were expressly qualified and allowed for a deviation from strict seniority-based layoffs to prevent an equal protection violation. It concluded: "Preventing layoffs that may be fairly anticipated to contribute to a constitutional violation is consistent with section 44955, subdivision (d)(2), such that no teacher rights are affected and UTLA has no grounds to object."

But even assuming that UTLA had some basis to object, the trial court further concluded that UTLA was not entitled to any additional finding. It reasoned that a trial on the merits was unnecessary because UTLA had fully participated in the proceeding and had an opportunity to litigate its objections to the consent decree. The trial court further explained that evidence of currently ongoing constitutional violations at each of the targeted schools was not necessary for the approval of the consent decree because the evidence established that constitutional violations could be fairly anticipated absent intervention. Finally, it concluded that substantial evidence showed that the targeted schools were constitutionally vulnerable and that further layoffs would prevent the District from providing an equal educational opportunity at its most struggling schools.

The trial court also rejected UTLA's argument that the individualized approach to deviation from seniority-based layoffs outlined in section 44955,

subdivision (d)(1) offered a viable alternative remedy. And it reasoned that the consent decree's " 'safeguard provision,' " which prevented layoffs from being redirected to schools that experienced layoffs above the District average, was consistent with teacher seniority rights and prevented further constitutional violations.

In addition to rejecting UTLA's argument that the consent decree improperly affected teacher seniority rights, the trial court addressed UTLA's other objections, finding that the consent decree would not serve to " 'fence in' " less effective junior teachers and prevent more experienced teachers from being assigned to struggling schools; it was unnecessary to follow the policies provided by a separate consent decree that involved new teacher hiring patterns as opposed to layoffs; and, while the consent decree would not eliminate teacher turnover altogether, it would serve to eliminate one source of disruption and potentially prevent the level of turnover from becoming a constitutional violation.

## II. *Due Process Did Not Require a Further Judicial Determination.*

In my view, UTLA was entitled to—and did—have its objections to the consent decree adjudicated. I cannot support the majority's conclusion that due process required not only a judicial determination of UTLA's objections, but also a trial on the merits of the Students' constitutional claims. Contrary to the majority's analysis of the relevant federal cases, I find that the law is neither as unambiguous nor as uniform as the majority suggests, and that the weight of authority holds a third party adversely affected by a consent decree is entitled to a judicial determination of its objections, which may occur in the context of a fairness hearing. The law therefore supports the trial court's conclusion that UTLA's objections were adequately adjudicated at the fairness hearing, and the consent decree is reasonable and consistent with teacher seniority rights as qualified by statute.[2]

### A. *Due Process Principles Governing Entry of a Consent Decree That Affects Third Party Rights.*

In general, the right to due process of law afforded by the United States and California Constitutions provides that a party must be given reasonable notice of a hearing and an opportunity to be heard. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; *Memphis Light, Gas & Water Div. v. Craft* (1978) 436 U.S. 1, 14 [56 L.Ed.2d 30, 98 S.Ct. 1554] ["[t]he purpose of

---

[2] While we would typically review an order approving a class action settlement for an abuse of discretion (e.g., *Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1118 [104 Cal.Rptr.3d 275]), we independently review a claim that due process rights have been violated (*Major v. Memorial Hospitals Assn.* (1999) 71 Cal.App.4th 1380, 1398 [84 Cal.Rptr.2d 510]).

notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing' "]; *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1279 [31 Cal.Rptr.3d 297] ["[t]he essence of procedural due process is notice and an opportunity to respond"].) Due process is flexible and its procedural protections depend on the particular case. (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 92 S.Ct. 2593].)

Guided in large part by the United States Supreme Court's statement in *W. R. Grace & Co. v. Rubber Workers* (1983) 461 U.S. 757, 771 [76 L.Ed.2d 298, 103 S.Ct. 2177] (*W. R. Grace*), that a consent decree between an employer and a government agency may not alter a collective bargaining agreement absent a "judicial determination," several federal courts have addressed the question of whether a consent decree may alter a union's or a similarly affected third party's statutory or contractual rights absent consent. Though the majority infers from this authority that, in every instance, a nonconsenting third party is entitled to a trial on the merits before its statutory or contractual rights may be altered, I find that courts consider the context of a nonconsenting party's objections to a consent decree in determining what type of judicial determination will satisfy due process.

### 1. *Supreme Court authority.*

In *W. R. Grace, supra*, 461 U.S. 757, the Equal Employment Opportunity Commission (EEOC) investigated employer W. R. Grace and found reasonable cause to believe that it had violated the law by discriminating in its hiring practices and perpetuating that discrimination in its seniority systems mandated by a collective bargaining agreement with the union. (*Id.* at p. 759.) The EEOC invited both the employer and the union to conciliate the dispute; the union declined to participate. (*Ibid.*) Though the employer initially filed suit against the EEOC, it later signed a conciliation agreement that served to alter the seniority provisions in the collective bargaining agreement. The district court thereafter granted summary judgment for the EEOC and the employer, finding that the conciliation agreement was binding on all parties, including the union. (*Id.* at pp. 760–761.)

Individual employees who were laid off pursuant to the conciliation agreement but who would have been retained under the collective bargaining agreement filed a series of grievances, and in one action an arbitrator concluded that the employer was liable for breach of the collective bargaining agreement. (*W. R. Grace, supra*, 461 U.S. at pp. 763–764.) In response, the employer instituted an action to overturn the award, and the Supreme Court

ultimately affirmed the award, reasoning that enforcing the collective bargaining agreement was not contrary to public policy because the "[employer] committed itself voluntarily to two conflicting contractual obligations." (*Id.* at p. 767.)

In the context of this conclusion, the court highlighted the important public policy served by conciliation, stating: "Enforcement of the Barrett award will not inappropriately affect this public policy. In this case, although the Company and the Commission agreed to nullify the collective-bargaining agreement's seniority provisions, the conciliation process did not include the Union. Absent a judicial determination, the Commission, not to mention the Company, cannot alter the collective-bargaining agreement without the Union's consent." (*W. R. Grace, supra*, 461 U.S. at p. 771.) In support of this proposition, the court cited *Alexander v. Gardner-Denver Co.* (1974) 415 U.S. 36, 44 [39 L.Ed.2d 147, 94 S.Ct. 1011], observing that the EEOC's "power to investigate and conciliate does not have coercive legal effect." (*W. R. Grace, supra*, at p. 771.) The court expressly encouraged unions to participate in the conciliation process in order to share the burdens imposed by the EEOC's demands. (*Id.* at p. 772.)

Nothing in *W. R. Grace* suggested that the union was entitled to a trial on the merits. Rather, the decision's concluding remarks emphasized that the union had not participated in the conciliation process and that, therefore, a "judicial determination" was necessary for the EEOC to effectively impose conditions that altered the collective bargaining agreement. (*W. R. Grace, supra*, 461 U.S. at p. 771.) A Supreme Court case decided shortly thereafter confirmed this interpretation. In *Firefighters v. Stotts* (1984) 467 U.S. 561 [81 L.Ed.2d 483, 104 S.Ct. 2576] (*Stotts*), the court reversed an injunction implementing proposed layoffs because the scope of an underlying consent decree did not encompass alterations to a collectively bargained seniority system and the court lacked inherent authority to modify the decree in such a manner. Beginning with an acknowledgement of "the difficulties inherent in allocating the burdens of recession and fiscal austerity," Justice O'Connor's concurrence pointed out that the proposed seniority alterations could have been achieved by the injured employees either going to trial to establish illegal discrimination or by their seeking the participation of the union in negotiating the consent decree. (*Id.* at pp. 583, 588 (conc. opn. of O'Connor, J.).) In connection with the latter option, Justice O'Connor cited the " 'judicial determination' " condition outlined in *W. R. Grace* and added: "Thus, if innocent employees are to be required to make sacrifices in the final consent decree, they must be represented and have had full participation rights in the negotiation process." (*Stotts, supra*, at p. 588, fn. 3 (conc. opn. of O'Connor, J.).)

Other Supreme Court cases following *W. R. Grace* and cited by the majority did not extend the reach of *W. R. Grace* to require a trial on the merits and merely reiterated the necessity of a judicial determination in varying factual circumstances. In *Firefighters v. Cleveland* (1986) 478 U.S. 501 [92 L.Ed.2d 405, 106 S.Ct. 3063] (*Local No. 93*), the court affirmed a consent decree in the face of the union's challenge that it violated statutory employment rights. Addressing the union's related assertion that the decree was invalid because it was entered without the union's consent, the court cited the principle that "an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree," and emphasized the extent of the union's participation: ". . . Local 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence; the District Court carefully considered these objections and explained why it was rejecting them. Accordingly, 'the District Court gave the union all the process that [it] was due . . . .' [Citation.]" (*Id.* at p. 529.) The court's subsequent statement that "[a] court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor," was directed to the outstanding claims that the union had raised as an intervening plaintiff. (*Id.* at pp. 529, 530.)

The remaining Supreme Court cases cited by the majority have no bearing on the circumstances presented here. (See *Martin v. Wilks* (1989) 490 U.S. 755, 762 [104 L.Ed.2d 835, 109 S.Ct. 2180] [affirming order holding that employees who had not been parties to consent decree or participated in its negotiation could later challenge employment decisions made pursuant to decree that affected their rights], superseded by statute on other grounds, 42 U.S.C. § 2000e-2(n); *Flight Attendants v. Zipes* (1989) 491 U.S. 754, 765–766 [105 L.Ed.2d 639, 109 S.Ct. 2732] [holding that an intervener may be entitled to attorney fees the same as a party].)

### 2. *Lower federal court authority.*

Building on its interpretation of Supreme Court authority, the majority finds that lower courts consistently hold a nonconsenting third party is entitled to a trial on the merits where a consent decree affects its statutory or contractual rights. Again, I do not glean such a uniform, bright-line rule from the relevant authority.

*U.S. v. City of Hialeah* (11th Cir. 1998) 140 F.3d 968 (*Hialeah*) offers the strongest support for the majority's position. In *Hialeah*, the United States Department of Justice concluded that the City of Hialeah's hiring practices

violated federal law. The department and the city negotiated a settlement agreement without any union participation. After they sought approval of the agreement as a consent decree, the local unions were joined as defendants. Thereafter, the unions were permitted limited participation in the fairness hearing; while they were able to present nonevidentiary objections, they were not allowed to present evidence that they claimed would rebut the statistical evidence the department had used to support its prima facie case. Though finding that the department had established a prima facie case of discrimination, the district court declined to approve the consent decree, finding it would create an adverse impact on union members and affect their contractual rights. (*Hialeah, supra,* at pp. 971–972.)

The court of appeals affirmed, determining that the requirements of due process "preclude any holding that a prima facie case is enough to justify dispensing with an objecting party's right to a full adjudication of its position on the merits in a trial." (*Hialeah, supra,* 140 F.3d at p. 976.) The *Hialeah* court stated that any alteration to collectively bargained employee rights must be done either with the union's consent or "pursuant to a decree entered after a trial at which all affected parties have had the opportunity to participate." (*Id.* at p. 983.) In reaching this conclusion, the court relied on Supreme Court authority and on *U.S. v. City of Miami, Florida* (5th Cir. 1981) 664 F.2d 435 (*City of Miami*).[3] (See *Hialeah, supra,* at pp. 975–978.)

*City of Miami* involved a proposed consent decree between the Attorney General and the city, to which the union objected as violating its union contract. (*City of Miami, supra,* 664 F.2d at p. 438.) The district court approved the decree after holding a hearing at which the union objected to the decree but offered no evidence in support of its position. (*Id.* at p. 439.) In a per curiam decision, the court found that the consent decree affected the contractual relationship between the city and the union, and concluded: "A party potentially prejudiced by a decree has a right to a judicial determination of the merits of his objection. The party is prejudiced if the decree would alter its contractual rights and depart from the governmental neutrality to racial and sexual differences that is the fundament of the fourteenth amendment in order to redress past discrimination. Those who seek affirmative remedial goals that would adversely affect other parties must demonstrate the propriety of such relief." (*Id.* at p. 447.) The court remanded the matter for "further proceedings," allowed for the ability of the Attorney General to prove discrimination "at trial," and directed that the union "be afforded the

---

[3] Although the majority presents *Hialeah* and *City of Miami* independently, as emanating from separate federal circuits, *City of Miami, supra,* 664 F.2d 435 necessarily serves as binding precedent for the Eleventh Circuit because it was decided by the en banc panel of the former Fifth Circuit. (See *Stein v. Reynolds Securities, Inc.* (11th Cir. 1982) 667 F.2d 33, 34; *United States v. DeKalb County, Georgia* (N.D.Ga., Dec. 20, 2011, No. 1:10-cv-4039-WSD) 2011 WL 6402203, *6, fn. 7 (*DeKalb*).)

opportunity either to contend that discrimination, the necessary predicate for relief, has not been proved, or to show that the type of relief embodied in [the consent decree] is, in this instance, unnecessary, inadvisable, or unconstitutional." (*Id.* at p. 448.)

*Hialeah* construed the *City of Miami* court's remand to require a trial on the merits of the discrimination claims. (*Hialeah, supra,* 140 F.3d at p. 977.) In so doing, the court ignored the concurring opinion in *City of Miami,* which advocated for "broader relief" and focused exclusively on the union's due process right to a trial on the merits. (*City of Miami, supra,* 664 F.2d at pp. 448–453 (conc. & dis. opn. of Gee, J.).) Indeed, if the *City of Miami* court's remand had required a trial on the merits, the entire concurring opinion would be superfluous. (See *id.* at p. 453 (conc. & dis. opn. of Gee, J.) [concurring opinion would have decreed the necessity of either the union's consent or a trial, but was in "full accord that at least the relief directed by Judge Rubin's opinion should be granted"].)

Accordingly, I do not construe *City of Miami* to require that a party affected by a consent decree is entitled to a trial on the merits. Nor do district courts bound by Fifth Circuit authority. *Lelsz v. Kavanaugh* (N.D.Tex. 1991) 783 F.Supp. 286 addressed the rights of a permissive-intervener parents association that contended its contractual rights were adversely affected by a settlement agreement between a class of mentally retarded students and several state institutions. The court concluded that the association's consent was not required, as it participated in the approval hearing, introduced evidence and aired its objections. (*Id.* at p. 294.) The court did not suggest that the association was entitled to a trial on the merits; instead it cited a number of cases for the proposition that "an intervenor's power to oppose a settlement, even when its interests are affected, is limited to the right to air its objections to the reasonableness of the settlement and to introduce evidence." (*Id.* at p. 292–293; see *San Antonio Hispanic Police Officers' Organization, Inc. v. City of San Antonio* (W.D.Tex. 1999) 188 F.R.D. 433, 455–458 [finding portion of a proposed consent decree not fair, adequate or reasonable because it adversely affected seniority rights conferred by a collective bargaining agreement, but making such determination via a fairness hearing].)

*Hialeah* is therefore isolated in its conclusion that a third party adversely affected by a consent decree is entitled to a trial on the merits. The unique approach taken by the Eleventh Circuit permits a single intervenor possessing a legal right that may be adversely affect by a consent decree to singlehandedly prevent entry of the decree—even one negotiated by a government entity for the benefit of the public. (*DeKalb, supra,* 2011 WL 6402203 at p. *7.) The *DeKalb* court contrasted the rule that had developed in the Eleventh Circuit with the approach taken elsewhere, observing that "other circuits have

limited the ability of intervenors to block the entry of a consent decree and require a district court to do no more than hear and consider the intervenors' objections in assessing the overall fairness of a decree." (*Id.* at p. *7 & fn. 8.) I agree with the other circuits that have not adopted *Hialeah*'s trial mandate and instead find that an objecting party's due process rights may be satisfied by its full participation in the settlement process and consequent judicial determination of the fairness of the settlement.

The Ninth Circuit has held that an objecting party's participation in a fairness hearing is adequate to protect its rights. In *U.S. v. City of Los Angeles, California* (9th Cir. 2002) 288 F.3d 391, the court reversed an order denying a police union leave to intervene to enjoin implementation of a proposed consent decree addressing police conduct. The union argued the decree was incompatible with its agreement with the city. After citing the general rule that "[e]xcept as part of court-ordered relief after a judicial determination of liability, an employer cannot unilaterally change a collective bargaining agreement as a means of settling a dispute over whether the employer has engaged in constitutional violations," the court explained that this rule entitled the union to intervene to participate in the fairness hearing: "[T]he Police League's interest in the consent decree is two-fold. To the extent that it contains or might contain provisions that contradict terms of the officers' MOU, the Police League has an interest. Further, to the extent that it is disputed whether or not the consent decree conflicts with the MOU, the Police League has the right to present its views on the subject to the district court and have them fully considered in conjunction with the district court's decision to approve the consent decree. [Citation.]" (*Id.* at p. 400; accord, *U.S. v. State of Oregon* (9th Cir. 1990) 913 F.2d 576, 582 ["A disputed decree that lacks the consent of those who negotiated it may be approved, so long as each party is given the opportunity to 'air its objections' at a reasonableness or fairness hearing."]; *Dennison v. Los Angeles Dept. of Water & Power* (9th Cir. 1981) 658 F.2d 694, 696 [rejecting union's suit as collateral attack on consent decree in part because "the Fairness Hearing held before the consent decree was formally adopted adequately afforded the union an opportunity to present to the court its view of the adverse impact of the decree on non-minority employees"]; *Alaniz v. California Processors, Inc.* (N.D.Cal. 1976) 73 F.R.D. 289, 291, 293 [intervenors' full participation in a six-day fairness hearing and evidence adduced at that hearing held sufficient to include seniority adjustments in a consent decree].)

The Tenth Circuit first touched on the issue of an intervening party's rights in *Sanguine, Ltd. v. U.S. Dept. of Interior* (10th Cir. 1986) 798 F.2d 389, which involved an appeal from an order granting an intervenor's motion to vacate a consent decree entered prior to intervention. The appeal followed a prior appeal, in which the court had reversed an order denying intervention,

finding that the intervenors had vested interests sufficient to justify intervention. (*Id.* at p. 390–391.) In light of its prior ruling and considering that issues affecting the intervenors were resolved by consent decree in their absence and not by adversary litigation, the court determined "this case presents a *unique situation* in which prejudice to the intervenors can be avoided only by setting aside the prior judgment and allowing the opportunity to litigate the merits of the case." (*Id.* at p. 391, italics added.) Later, in *Johnson v. Lodge # 93 of Fraternal Order of Police* (10th Cir. 2004) 393 F.3d 1096, 1100–1101 (*Johnson*), the Tenth Circuit affirmed an order approving a consent decree between a city and African-American members of the police department, issued following a fairness hearing where the objecting union had fully participated by calling and cross-examining witnesses and introducing evidence to support its position. The appellate court specifically affirmed the district court's findings that the consent decree did not conflict with the union's statutory and contractual rights and that the union was not entitled to a trial on the merits of the underlying discrimination claims. (*Id.* at pp. 1104–1109.) With respect to the latter point, the court expressly distinguished *Sanguine*, emphasizing that "[t]he intervenor in *Sanguine* was not granted intervenor status prior to entry of the decree and thus was unable to effectively present its objections to the decree. In contrast, here, the district court permitted FOP [(the union)] to intervene prior to settlement negotiations, to file written objections to the consent decree in the district court, and to participate in the fairness hearings as a full party to the litigation." (*Johnson, supra*, at pp. 1108–1109.)

The Third Circuit has similarly concluded that participation in a fairness hearing satisfies due process. In *Equal Employment Opportunity Com. v. American Telephone & Telegraph Co.* (3d Cir. 1977) 556 F.2d 167, unions appealed from an order approving a consent decree between the EEOC and a telephone company designed to remedy past discrimination, asserting the decree affected their collective bargaining rights. Affirming the order, the court rejected the unions' assertion that the consent decree improperly affected third party rights, observing that "[t]o the extent that third party rights in which the unions are interested have been affected, they were allowed to intervene and be heard in this case," and noting that because the unions received a full opportunity to present their position the consent decree was overly broad, the posture of the case was equivalent to "that of a fully litigated decree." (*Id.* at pp. 173, 174.)

The Sixth Circuit was even more direct in *Tennessee Assn. of Health Maintenance Organizations, Inc. v. Grier* (6th Cir. 2001) 262 F.3d 559 (*Grier*). There, the district court approved a consent decree between Tennessee Medicaid recipients and state defendants, and intervening managed-care organizations asserted the decree imposed obligations beyond their contracts. (*Id.* at p. 563.) Finding that the district court erred by approving the consent

decree in a summary proceeding, the appellate court remanded the matter. Citing both *Local No. 93, supra,* 478 U.S. 501 and *Hialeah, supra,* 140 F.3d 968, the court specifically delineated the scope of the intervenors' rights: "In sum, although intervenors are entitled to a fairness hearing on remand, we reject intervenors' suggestion at oral argument that the fairness hearing must entail the entire panoply of protections afforded by a full-blown trial on the merits. The principles articulated above belie such an approach. The fairness hearing is a forum for the intervenors to voice their objections; however, the district court has the discretion to limit the fairness hearing, and the consideration of those objections, so long as such limitations are consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable." (*Grier, supra,* at p. 567.)

Neither the First nor the Second Circuit has directly addressed the issue. (See *Durrett v. Housing Authority of City of Providence* (1st Cir. 1990) 896 F.2d 600, 604 [citing as a factor to consider in approving a consent decree that "if third parties will be affected, that it will not be unreasonable or legally impermissible as to them," but acknowledging that no protesting third parties had appeared]; see also *U.S. v. Brennan* (2d Cir. 2011) 650 F.3d 65, 117 [addressing unilateral action by an employer and consequently stating, "whatever standard applies in a case in which . . . a court is deciding whether to approve a settlement or to enter it as a consent decree, is not germane to this case which does not present any of those situations"]; *Kirkland v. New York State Dept. of Correctional Services* (2d Cir. 1983) 711 F.2d 1117, 1126–1128 & fn. 11 [distinguishing *City of Miami* and its conclusion that "[a] party potentially *prejudiced* by a decree has a right to a judicial determination of the merits of its objection" because the intervening employees did not establish actual prejudice but only effect on the mere expectation of promotions]; *Wilder v. Bernstein* (S.D.N.Y. 1986) 645 F.Supp. 1292, 1318–1320 [approving consent decree between class of foster children and the state over objection of intervening childcare agencies, and resolving whether agencies were subject to decree's enforcement provision as defendants even though they had not consented to its terms].)

Finally, in a Seventh Circuit case that bears some factual similarity to the instant matter, *People Who Care v. Rockford Bd. of Education* (7th Cir. 1992) 961 F.2d 1335, 1336 (*People Who Care*), the district court approved a consent decree between a class of students and the school board designed to remedy racial imbalances and provide supplemental programs for disadvantaged students. By providing the manner in which teachers would be assigned to those programs, the consent decree altered the seniority rules which were part of collective bargaining agreements. (*Ibid.*) The district court held a " 'necessity hearing' " to consider the unions' objectives, and thereafter found a sufficient factual predicate for the decree and held that seniority alterations were necessary for the decree to work. (*Id.* at p. 1337.)

Acknowledging that "[r]emedies for violations of the Constitution may include altering statutory or contractual rules for assigning teachers to schools," the *People Who Care* court posed the question whether "proof of a violation [is] essential to the adoption of a remedy that affects third parties." (*People Who Care, supra,* 961 F.2d at p. 1338.) It answered that question affirmatively, finding that the remedy of changing seniority rights must be tethered to some underlying wrong. (*Ibid.*) The court then turned to the related question of what type of finding must be made to support the seniority alteration, and concluded that "before altering the contractual (or state-law) entitlements of third parties, the court must find the change necessary to an appropriate remedy for a legal wrong. Even if this finding may come on abbreviated proceedings (a subject we have not decided), there must be such a finding. As there is none, we direct the district court to vacate those portions of the decree overriding the seniority provisions of the collective bargaining agreements or relieving the Board of its obligation to bargain with the unions." (*Id.* at p. 1339.) Notably, despite earlier citing to *City of Miami, supra,* 664 F.2d 435, the court remanded the matter to enable the district court to make an appropriate finding; it did not remand the matter for a trial on the underlying discrimination claims. (*People Who Care, supra,* at p. 1339.)

In sum, while federal courts uniformly hold that an adversely affected third party is entitled to adjudication of its objections to a consent decree, only *Hialeah, supra,* 140 F.3d 968 has mandated a trial on the merits of the claims underlying the necessity for the decree. Other courts have evaluated a variety of factors, including the degree of the third party's participation in the negotiation of the decree (e.g., *W. R. Grace, supra,* 461 U.S. at p. 771), the extent to which the third party was afforded the right to present and object to evidence concerning the fairness of the decree (e.g., *Johnson, supra,* 393 F.3d at pp. 1108–1109) and whether the third party has asserted affirmative claims (*Local No. 93, supra,* 478 U.S. at pp. 529–530) to determine whether participation in the fairness hearing satisfies due process.

## B. *UTLA Received Due Process.*

Applying the relevant legal principles here, I am satisfied that UTLA had a meaningful opportunity to be heard and received an appropriate judicial determination that adjudicated the merits of its objections to the consent decree. The trial court heard and rejected UTLA's assertion that the consent decree improperly infringed on its rights afforded by statute and under the CBA, ruling that " 'the Education Code expressly allows a school district to "deviate from terminating a certificated employee in order of seniority for . . . purposes of maintaining or achieving compliance with constitutional requirements related to equal protection of the laws." ' " (See *Butt v. State of*

*California* (1992) 4 Cal.4th 668, 680–681 [15 Cal.Rptr.2d 480, 842 P.2d 1240] [recognizing a student's right to equal educational opportunity].)

Moreover, the trial court heard and rejected UTLA's more specific challenge to the consent decree that preventing RIF's at the targeted schools was overly broad, finding "the evidence adequately supports the conclusion that additional turnover, caused by a Reduction in Force, at the targeted schools would cause material harm to faculty stability and the ability to deliver basic educational opportunity to the students in the schools." Extensively citing expert and lay witness testimony, as well as statistical evidence, the trial court specifically found that the remedy proposed by the consent decree was reasonably tailored to prevent further constitutional violations arising from RIF's. (See *People Who Care, supra*, 961 F.2d at p. 1339 [trial court must find consent decree's alteration to third party rights necessary to alleviate constitutional violation].)

Importantly, the context in which the trial court made its determinations demonstrated that the fairness hearing adjudication sufficiently protected UTLA's due process rights. UTLA intervened in the action before negotiations surrounding the consent decree had even begun. It had the ability to participate in all and participated in some of the negotiations leading to the consent decree. (See *Johnson, supra*, 393 F.3d at p. 1108 [finding significant that the union intervened prior to settlement negotiations as part of determination that union's participation in fairness hearing satisfied due process]; cf. *W. R. Grace, supra*, 461 U.S. at pp. 770–771 [public policy served by conciliation process not implicated where the process did not include the union]; *Hialeah, supra*, 140 F.3d at pp. 971–972 [unions were not included in settlement negotiations and were not invited to participate in formulation of settlement agreement].)

Further, like the objecting intervenors in *Local No. 93, supra*, 478 U.S. at page 529, *Johnson, supra*, 393 F.3d at pages 1108 to 1109, *U.S. v. City of Los Angeles, California supra*, 288 F.3d at page 400 and *Equal Employment Opportunity Com. v. American Telephone & Telegraph Co., supra*, 556 F.2d at pages 173 to 174, UTLA actively voiced its objections to the decree and fully participated in an evidentiary fairness hearing that resulted in an adjudication of its objections to the decree. Certainly, proceedings short of a fairness hearing fail to satisfy due process. (See *Grier, supra*, 262 F.3d at pp. 566–567 [remand for fairness hearing where intervenors moved to set aside consent decree but district court never provided them a forum to present their arguments]; *People Who Care, supra*, 961 F.2d at p. 1338, 1339 [" 'necessity hearing' " an inadequate process to determine whether third parties' statutory and contractual entitlements could be altered by a consent decree].) But where, as here, an objecting party has had a full and fair opportunity to

present evidence and argument at a fairness hearing on the question of whether a consent decree improperly affects its statutory and contractual rights, nothing more is required. (E.g., *U.S. v. City of Los Angeles, California, supra*, at p. 400 [to the extent it was disputed whether consent decree conflicted with union contract, union had the right to present its views and have them considered in connection with the court's decision whether to approve the consent decree]; see *Hialeah, supra*, 140 F.3d at pp. 989–990 (dis. opn. of Kravitch, J.) ["It is clear, then, that a district court may enter a consent decree despite the objections of a party after conducting a fairness hearing at which the objector 'is entitled to present evidence and have its objections heard,' [citation], even if the decree modifies 'employee expectations arising from a seniority system agreement,' [citation]." (fns. omitted)].)

Finally, UTLA joined the action as an intervening defendant and therefore did not assert any affirmative claims requiring a trial. In *Local No. 93, supra*, 478 U.S. at page 529, the court noted that a settlement cannot resolve the valid claims of nonconsenting intervenors and "if properly raised, these claims remain and may be litigated by the intervenor. [Citations.]" (See *White v. State of Alabama* (11th Cir. 1996) 74 F.3d 1058, 1075, fn. 53 [explaining that in *Local No. 93*, the court rejected the argument that the consent decree was invalidly entered without the union's consent, "because the union had presented no claim for relief to the district court; that is, it had no cause of action in its own right and it could not prosecute reverse discrimination claims (of its members) that had not yet arisen"]; see also *Hialeah, supra*, 140 F.3d at pp. 989, 990 (dis. opn. of Kravitch, J.) [explaining that because the objecting parties in *Local No. 93* were not prosecuting a claim for relief, "[t]he district court's fairness hearing in that case sufficed to justify entry of the decree, notwithstanding the union's argument that it would affect the contractual expectations of its members"].)

The record here stands in sharp contrast to the facts in *Hialeah, supra*, 140 F.3d at pages 983 to 984, where the court summarized: "What happened in this case is that the Department of Justice and the City of Hialeah crafted a settlement agreement without the consent or input of the unions or individual police and firefighters whose contractual rights, recognized and protected under Florida law, would be affected by the agreement." That is not what happened here. UTLA was a party to the proceedings throughout the negotiation of the consent decree, and had a full and fair opportunity to litigate its objections to the decree. UTLA received a judicial determination that constitutional violations occurring now and in the future mandated a remedy. The trial court further determined that the remedy provided by the consent decree was not in conflict with the teachers' statutory or contractual rights. Finally,

UTLA received a specific determination that a trial was unwarranted under applicable law. UTLA received the process it was due. (See, e.g., *Johnson, supra*, 393 F.3d at p. 1109; *U.S. v. City of Los Angeles, California, supra*, 288 F.3d at p. 400; *Equal Employment Opportunity Com. v. American Telephone & Telgraph Co., supra*, 556 F.2d at p. 174.)

Consequently, I would affirm the judgment.

The petitions of all respondents for review by the Supreme Court were denied October 24, 2012, S205446.